UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE THOMAS E. CARLSON, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 04-33526-TEC |
| | ) Chapter 11 |
| | ) |
| DEMAS WAI YAN, aka Dennis Yan, | ) |
| | ) |
| | ) |
| Debtor. | ) |
| | ) |
| _____ | ) |
| | ) |
| DEMAS WAI YAN, aka Dennis Yan, | ) Adv. No. 05-3257 |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DONG FU, aka Tony Fu, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |
| | ) |
| WEI SUEN, | ) Adv. No. 05-3257 |
| | ) |
| Plaintiff, | ) <u>TRIAL, PHASE 2</u> |
| | ) <u>VOLUME II</u> |
| v. | ) |
| | ) Partial transcript: |
| DEMAS YAN, et al., | ) Testimony of Witness |
| | ) Demas Yan only |
| Defendants. | ) |
| _____ | ) |
| | ) |
| STELLA CHEN, | ) Adv. No. 05-3236 |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DEMAS WAI YAN aka DENNIS YAN, | ) |
| | ) |
| Defendant. | ) Thursday, December 1, 2005 |
| _____ | ) San Francisco, California |

Appearances listed on the next page.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 1 of 92

Appearances:

For Demas Yan:                Law Offices of Mark J. Romeo
                              By:  Mark J. Romeo, Esq.
                              130 Sutter Street, Seventh Floor
                              San Francisco, California  94104
                              (415) 395-9315


For Wei Suen:                 Corporate Counsel Law Group
                              By:  John Chu, Esq.
                              505 Sansome Street, Suite 475
                              San Francisco, California  94111
                              (415) 788-4315


For Tony Fu:                  Tony Fu, *pro se*


For Stella Chen:              Stella Chen, *pro se*


Digital Court                 United States Bankruptcy Court
Reporter:                     Clerk of the Court
                              Jane L. Galvani
                              235 Pine Street, 23rd Floor (94104)
                              Post Office Box 7341
                              San Francisco, California  94120-7341
                              (415) 268-2366


Certified Electronic          Palmer Reporting Services
Transcriber:                  P. O. Box 30727
                              Stockton, California  95213-0727


                    Proceedings recorded by digital recording;
         transcript produced by federally-approved transcription service.

I N D E X

Witnesses:

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **Demas Yan** | | | | |
| By Mr. Romeo: | 4 | | 89 | |
| By Mr. Chu: | | 65 | | |

Exhibits:          Received in Evidence

| | |
|---|---|
| Exhibit UU: | page 10 |
| Exhibit KK: | page 25 |
| Exhibit LL: | page 27 |
| Exhibit PP: | page 29 |
| Exhibit RR: | page 33 |
| Exhibit NN: | page 37 |
| Exhibit OO: | page 38 |
| Exhibit JJ: | page 44 |
| Exhibit SS: | page 45 |

1    Thursday, December 1, 2005                1:33 o'clock p.m.

2                    P R O C E E D I N G S

3              DEMAS YAN, DEBTOR/PLAINTIFF, SWORN

4         THE CLERK:  Be seated.  Please state your full name

5    and address for the record.

6         THE WITNESS:  Yes.  My name is Demas Yan and my

7    address is 1433 Seventh Avenue, San Francisco.

8         MR. ROMEO:  I'd like to use an exhibit that we marked

9    in Phase 1.  It's the agreement that we're all familiar with,

10   the —

11        THE COURT:  The October agreement?

12        MR. ROMEO:  Yeah, I'm going to use my copy of Exhibit

13   D.

14        THE COURT:  Okay.

15        MR. ROMEO:  I'll give that to the witness.

16        THE COURT:  Now as I recall, here it's part of II?

17        MR. ROMEO:  II, correct.

18        THE COURT:  Yeah, okay.

19        MR. ROMEO:  It's exhibit — an exhibit —

20        THE COURT:  I'll use that version — that copy, rather.

21   It shouldn't be a different version.

22        Go ahead.

23                    DIRECT EXAMINATION

24   BY MR. ROMEO:

25   Q.  Okay.  Mr. Yan, do you have Exhibit D in front of you?

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 4 of 92

1   A.  Yes.

2   Q.  And that was executed between you and Mr. Fu in October

3   2000?

4   A.  Yes.

5   Q.  At the time that the — that that document was executed, was

6   there a discussion between you and Mr. Fu as to what respective

7   roles or responsibilities would be undertaken by each of you?

8   A.  It's always been clear between us, is that I'm the one who

9   would put up the money and he's the one who would do the job as

10   the contractor.

11          MR. CHU:  Objection, nonresponsive.

12          THE COURT:  I think the question was just did you have

13   an understanding.

14          MR. CHU:  I think the question was did you have a

15   discussion with Mr. Fu.  And then his answer was it —

16          THE COURT:  Okay.

17          MR. CHU:  — the answer was it has always been clear

18   this and that, so.

19          THE COURT:  So I think that —

20          MR. ROMEO:  The answer's a yes —

21          THE COURT:  And I think he's right that — well, you

22   need a yes or a no to this.

23          MR. ROMEO:  Correct.

24          THE COURT:  You need to focus on what the other party

25   said, not his subjective understanding.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 5 of 92

1          MR. ROMEO:  Correct.

2   BY MR. ROMEO:

3   Q.  So you did discuss these roles and responsibilities between

4   the two of you?

5   A.  Yes.

6   Q.  Did you and Mr. Fu reach an agreement as to what those roles

7   and responsibilities were going to be?

8   A.  Yes.

9   Q.  What was the — what were the respective roles and

10  responsibilities of each of you?

11  A.  His role is solely as the contractor and I'm the one who

12  owns the property and would put up the money.

13  Q.  Was Mr. — was Mr. Fu working on other projects at the time?

14  A.  At what time?

15  Q.  At the time that you entered into the agreement with him.

16  A.  In 2000 — in October of 2000 he was still designated as the

17  contractor for my other property at 547 Twenty-Third Avenue.

18  Q.  So were you working with him on that project?

19  A.  But that project was stopped by the City in, I believe,

20  April or May — April or May of 2000.  So it was stopped.  And at

21  the time I was appealing the stop — the stoppage.  So even

22  though he was still the designated contractor he wasn't doing

23  any active work on that project.

24  Q.  Now —

25          THE COURT:  And that was 2000?

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 6 of 92

1          THE WITNESS:  Yes.

2    BY MR. ROMEO:

3    Q.  Mr. Fu, did you know whether he had a contractor's license

4    in October 2000?

5    A.  Yes.

6    Q.  Did he have a contractor's license?

7    A.  Yes.

8    Q.  Did he tell that to you?

9    A.  Yes.

10   Q.  Did he say anything to you prior to the execution of the

11   October 18th, 2000 agreement about inactivating his license?

12   A.  No.

13   Q.  Did he say anything to you prior to the October 18th, 2000

14   agreement about getting —

15          MR. CHU:  Leading.

16   BY MR. ROMEO:

17   Q.  — out of the contracting business?

18          MR. CHU:  Leading.  Leading again.  Objection.

19          THE COURT:  Sustained.

20   BY MR. ROMEO:

21   Q.  Mr. Fu testified that he told you, and you were here present

22   in the trial, that he was getting out of the contracting

23   business; did you — do you recall that testimony?

24   A.  Yes.

25   Q.  Did he make any such statements to you prior to October

Case: 04-33526   Doc#:129  Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 7 of 92

1   18th, 2000?

2   A.  No.

3   Q.  Did he make any statements to you about that after October

4   18th, 2000?

5   A.  No.

6           MR. CHU:  That's leading again, Your Honor.

7           THE COURT:  I don't know how else he asks it.

8           MR. CHU:  I think he can direct the witness to the

9   subject area, but then to solicit yes or no answers like that

10  afterwards I think is leading.  I think he can — he can ask him

11  what did — what if anything did Mr. Fu say about, you know, his

12  contractor's license status.

13          THE COURT:  I'll allow the question.

14          Go ahead.

15          THE WITNESS:  The answer's no.

16  BY MR. ROMEO:

17  Q.  Can you open the exhibit book to Exhibit UU, please?

18  A.  Okay.

19  Q.  Can you tell the Court what Exhibit UU is?

20  A.  That's the Certificate of Final Completion and Occupancy.

21  Q.  Were you familiar with the state of the Chenery project on

22  the date that the Certificate of Completion was issued?

23  A.  Yes.

24  Q.  And what was the state of that project?

25  A.  Everything was done, but there's some — still some touch up

Case: 04-33526   Doc#: 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 8 of 92

1   to be done, I think.  Like the painting job wasn't done in a — I

2   would say a satisfactory fashion.  I believe there needs to be

3   some clean up by the bathroom tubs, as they were dirty.  I think

4   that's the nature of things that were left.

5           MR. ROMEO:  Your Honor, I'd like to move Exhibit UU

6   into evidence.

7           THE COURT:  Any objection?

8           MR. CHU:  No objection except UU doesn't have an

9   issuance date on it.  There are copies of —

10          THE COURT:  No, it is — it is somewhat ambiguous

11  because there is a date on the left side, but not on the right

12  side.

13          MR. CHU:  There are copies of the Certificate of

14  Occupancy floating around other places that has the issuance

15  date.

16          THE COURT:  Well, it's obviously on or after July '03.

17  July 22nd.

18          MR. CHU:  Oh, actually I have a copy —

19          THE COURT:  Do you?

20          MR. CHU:  Yes, I have copies.  Maybe we can substitute

21  this into UU instead.

22          MR. ROMEO:  Would that be all right with Your Honor?

23          THE COURT:  Of course.

24          MR. ROMEO:  Okay.

25          THE COURT:  There's no objection.

Case: 04-33526   Doc#: 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 9 of 92

1    MR. ROMEO:  Let me show it to the witness first.

2    THE WITNESS:  Okay.

3  BY MR. ROMEO:

4  Q.  Is that the Certificate of Completion, Mr. Yan?

5  A.  Yes.

6    MR. ROMEO:  I'd like to move substituted UU into

7  evidence.

8    MR. CHU:  No objection.

9    THE COURT:  Okay.  What date does it have, by the way?

10    MR. CHU:  August 7, 2003.

11    THE COURT:  Okay.  Thank you.

12    (Exhibit UU received in evidence.)

13  BY MR. ROMEO:

14  Q.  Could you go to the exhibit book to Exhibit YY?

15  A.  Okay.

16  Q.  How long have you known Tony Fu?

17  A.  I would say either 1990 or '91, that timeframe.

18  Q.  Have you ever done other ventures with him prior to the

19  Chenery project?

20  A.  Yes.

21  Q.  Do you — are you familiar with his handwriting?

22  A.  Yes.

23  Q.  Are you familiar with his signature?

24  A.  Yes.

25  Q.  Can you tell me if on Exhibit — can you, first of all, tell

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 10 of 92

1  me what Exhibit YY is?

2  A.  It's the application for demolition permit for this project

3  at Chenery Street.

4  Q.  Can you tell me whose handwriting is shown in the box where

5  it requests general contractor information on the demolition

6  permit?

7  A.  That appears to be Tony's handwriting.

8  Q.  Going to the second page, do you recognize the signature at

9  the bottom?

10 A.  This signatures, I've seen it before.  It appears to be

11 Tony's signature.

12 Q.  Could you go to Exhibit ZZ?

13 A.  Yes.

14 Q.  Can you tell me what Exhibit ZZ is?

15 A.  It's the application for the building permit for Chenery

16 Street.

17 Q.  Directing your attention to the same box, the information on

18 the general contractor, can you tell me whose handwriting that

19 is?

20 A.  That's the same handwriting on the demolition permit and

21 appears to be Tony's handwriting.

22 Q.  And do you recognize the signature on the second page?

23 A.  Yes.  Appears to be Tony's.

24 Q.  Can you go to Exhibit AAA?

25 A.  Okay.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 11 of 92

1   Q.  And the information at the top showing the job address, the

2   owner, the general contractor, and the licensed information, can

3   you tell me whose handwriting that is?

4   A.  That also appears to be Tony's handwriting.

5   Q.  And what is Exhibit AAA?

6   A.  It's a permit for electrical wiring and fixtures for Chenery

7   Street.

8   Q.  And who — do you recognize the signature in the box where it

9   says "Valid state contractor's license number and classes" in

10  the middle of the document?

11  A.  Yes.  That's Tony's signature.

12  Q.  Tony Fu?

13  A.  Yes.

14  Q.  And at the bottom, whose signature is that?

15  A.  That's the same signature, appears to be Tony's.

16  Q.  Can you go to Exhibit BBB?

17  A.  Okay.

18  Q.  What is Exhibit BBB?

19  A.  It's the permit for plumbing and mechanical, also for

20  Chenery Street.

21  Q.  And in the second box down, where it says, "Contractor's

22  signature," whose signature is that?

23  A.  That appears to be Tony's signature.

24  Q.  And the information in that box detailing the general

25  contractor information, whose handwriting is that, Mr. Yan?

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 12 of
92

1   A.  That also appears to be Tony's handwriting.

2   Q.  Whose signature is that at the bottom?

3   A.  Appears to be Tony's.

4   Q.  Going to Exhibit CCC.

5   A.  Okay.

6   Q.  Can you tell the Court what Exhibit CCC is?

7   A.  I believe this is a gen- — general permit application.  It's

8   application for building permit, additions, alterations, or

9   repairs.  And looking down in the box 16, it says this

10  application is for install fire alarm system in existing

11  building.

12  Q.  Whose signature is at the bottom?

13  A.  That's Tony Fu's signature.

14  Q.  Do these — do these permits, are these the only permit

15  applications that were issued on the Chenery Street project?

16  A.  No.

17  Q.  Were there others?

18  A.  Yes.

19  Q.  Were there others that were signed by you?

20  A.  I believe there were a couple that were signed by me.

21  Q.  And who prepared those?

22  A.  They were all prepared by, I believe, Tony.

23  Q.  Were those others that were signed by you, did they should

24  Tony Fu or San Francisco Contractors Association as the general

25  contractor?

1   A.  I would need to look at them again.  I think some of them

2   may, but I believe quite a few of them I signed that Tony did

3   not put down his license information.

4   Q.  Did you ever sign a permit as an owner-builder?

5   A.  I believe so, yes.

6   Q.  Or sign a permit application, I should say?

7   A.  Yes.

8   Q.  How many times?

9   A.  I believe maybe two or three times.

10  Q.  And to these were all for the Chenery project?

11  A.  Those were for Chenery project and they were revisions to

12  the original permit that was issued under Tony's licensing.

13  Q.  Was there a particular time period in which you signed as an

14  owner-builder as opposed to having a general contractor?

15  A.  Can you repeat the question again?

16  Q.  Was there a period of time during which you signed as an

17  owner-builder as opposed to general contractor?

18  A.  I — I recall that I signed a couple of the revision permits,

19  I believe beginning in the early 2000 — probably early 2001, I

20  believe.  And that was because I think at the time Tony had a

21  judgment against him and that's what — that's when he began to

22  omit his licensing information on the permits.

23  Q.  Can you look at Exhibit OO, please?

24  A.  Exhibit OO?

25  Q.  Yes.

1  A.  Okay.

2  Q.  Did you prepare Exhibit OO?

3  A.  Yes.

4  Q.  Can you tell the Court what it is?

5  A.  I prepared this after I obtained the canceled checks for the

6  Bank of America account under the name San Francisco Building

7  Professionals.

8  Q.  Okay.  But did you prepare this?

9  A.  I did, yes.

10  Q.  And what — did you use any source documents for this?

11  A.  I used the canceled checks.

12  Q.  And does this show all of the canceled checks?

13  A.  Yes.

14  Q.  Where did you get the canceled checks for the San Francisco

15  Building Professionals account?

16  A.  I had to request BofA for the copies.  This was back in

17  December of 2004.

18  Q.  Did you ever have access to a Post Office mailbox at 5813

19  Geary, PMB 188?

20  A.  No.

21  Q.  After this account was set up did you receive the canceled

22  checks or the statements on a regular basis?

23  A.  No.

24  Q.  How did you — did you get statements for this account?

25  A.  No.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 15 of
92

1   Q.   Looking at Exhibit PP, can you tell me what those are?

2   A.   Those are the — the bank statements for this BofA account.

3   Q.   How did you get those statements?

4   A.   At the same time when I got this canceled checks, I request

5   to BofA for back copies.

6   Q.   And when did you make that request to BofA?

7   A.   December of 2004.

8   Q.   Going back to Exhibit O, then does this accurately summarize

9   in numeric — does this accurately summarize all of the checks

10  that were paid through the San Francisco Building Professionals

11  account —

12  A.   Okay.  You mean Exhibit OO.

13  Q.   Well, let me — yeah, OO.

14  A.   Okay.  Yes.

15  Q.   On some of these payees, do you — do you know if they are

16  people who worked on the Chenery project?

17  A.   I could only make out one that I — I can associate the name

18  with the face.

19  Q.   All right.  Did you hire any of the laborers or workers for

20  the Chenery project?

21  A.   No.

22  Q.   Did you know any of those — any of the — well, first of all,

23  during the construction of the Chenery project, did you ever

24  visit the site?

25  A.   Yes.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 16 of
92

1  Q.  How often?

2  A.  Very often.  Whenever I'm around.  I would say maybe once a

3  day or maybe every other day.

4  Q.  And during — give me a beginning date and an ending date

5  that you would visit it if you were in town?

6  A.  I would say from the very beginning, when Tony began to

7  demolish the building up till the very end.  Whenever I'm in San

8  Francisco, if I'm not away from San Francisco, I would visit the

9  site by —

10  Q.  Did you —

11  A.  — on a daily basis almost.

12  Q.  Did you observe people working at the site when you visited

13  it?

14  A.  Yes.

15  Q.  Did you know any of those people before the Chenery project

16  was commenced?

17  A.  No.

18  Q.  By the way, do you know who — who Ming Fong is?

19  A.  I met him actually twice.  Once in — the first time in San

20  Francisco.

21  Q.  When?

22  A.  I don't recall when.  I think it was probably before we

23  actually began work on this project.  And I recall it was just a

24  social, a lunch where Tony introduced me to him and said that he

25  was a friend who was just visiting from China.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 17 of 92

1   Q.  Okay.  Did you — and you said you met him on another

2   occasion?

3   A.  And after the first meeting, then I obtain his business card

4   in Hong Kong.  And during one of my trips to Hong Kong I call

5   him up, and we had lunch as well.

6   Q.  Do you recall the year in which you had lunch with Mr. Ming

7   Fong in Hong Kong?

8   A.  I think it's probably — I would — I don't really recall, but

9   I think it's before all this work began at Chenery.  Probably, I

10  think, in 2000 or that timeframe.

11  Q.  At the lunch that you met Mr. — Mr. Fong at, do you recall

12  if that was — do you recall the year that that took place?

13  A.  No, I don't recall.

14  Q.  Do you know what Mr. Fong's occupation is?

15  A.  He told me and his business card also indicates that he's a

16  restauranteur.  He owns a restaurant in China.

17  Q.  Did you ever see — would you recognize Ming Fong if he

18  walked into this courtroom?

19  A.  I think so.

20  Q.  Did you ever see Ming Fong at the construction site on

21  Chenery Street?

22  A.  No.

23  Q.  Did Tony ever mention that Ming Fong was employed at the

24  Chenery project?

25  A.  No.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 18 of
92

1    Q.   Can you take a look at Exhibit HH, please?

2    A.   Okay.   Okay.

3    Q.   Is this one of the documents you produced in this

4    litigation?

5    A.   Yes.

6    Q.   Where —

7    A.   Oh, sorry.  I take it back.  This was actually produced by

8    Tony at his deposition.

9    Q.   Okay.  Have you ever seen it before the litigation?

10   A.   Yes.

11   Q.   The first page, it — appears to be a fax letter to Tony from

12   Dennis Yan?

13   A.   Yes.

14   Q.   Did you write that letter?

15   A.   Yes.

16   Q.   Do you see the next page where — the next two pages where

17   there's quite a bit of written comments on this — on this

18   document?  Did — did you ever get that from Mr. Fu before the

19   litigation?

20   A.   Yes.

21   Q.   Can you give me a date or year?

22   A.   I think it's pretty much close to the date of the original

23   mailing of this fax.  This fax was sent in January 28, 2002, so

24   I think I place this like maybe within the week after the

25   sending of this.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 19 of
92

1   Q.   In other words, — and what exactly was this supposed to be?

2   A.   I just want to keep Tony abreast of my contribution to the

3   construction-related expenses, because I want to remind him

4   that, you know, once I — my contribution limit of $300,000, then

5   he will step in and foot the bills.

6   Q.   With regard to that $300,000 limit, you heard Mr. Fu testify

7   that all of that had to be paid through the San Francisco

8   Building Professionals account?

9   A.   Yes, I heard his testimony.

10  Q.   Was there an agreement between you and Mr. Fu that your

11  300,000 contribution to the project had to be paid through the

12  San Francisco Building Professionals account?

13  A.   No.

14  Q.   Can you go to Exhibit II?

15  A.   Okay.

16  Q.   Now when we were looking at Exhibit HH there were some

17  handwritten notations.  Did you understand those to be

18  objections or comments that Mr. Fu had —

19  A.   Yes.

20  Q.   — to your accounting?

21  A.   Yes.

22  Q.   Did you make any corrections to the accounting as a result

23  of his objections?

24  A.   Yes.

25  Q.   And can you point out on Exhibit II what corrections you

1  made as a result of his comments —

2  A.  Okay.  Referring to Exhibit HH, page 2, the first item that

3  he objected to is dated February 11th, and the type.  That is

4  payment to Steve Law (phonetic).  And the original amount I put

5  down on the first fax was 600,-.  And then he made a notation on

6  the right-hand side to 300,-.

7          So in the subsequent fax in Exhibit II, if you look at

8  that, the same entry, Steve Law, I change it to 300,-, as he

9  indicated.  But in Exhibit II, he also put down in the notation,

10  "not agree" on the right-hand side of the $300 [sic], even

11  though that's why I change to, according to Tony's comment.

12  Q.  Okay.  And exhibit — Exhibit II was — was this supposed to

13  be a response to his comments on Exhibit HH?

14  A.  I don't think this is the immediate response.  I think I

15  probably had subsequent fax accountings to him before this.  I

16  think — I think I — I'm pretty sure I send the fax accounting to

17  him more than one — more than on two occasions.

18  Q.  Now with respect to Exhibit II, do you recognize Tony Fu's

19  handwriting on any of this?

20  A.  Yes.

21  Q.  Did — did you ever receive a marked-up copy of Exhibit II

22  from Tony Fu prior to the litigation?

23  A.  Yes.

24  Q.  When did you receive such a document?

25  A.  Again, probably pretty soon within the time I — within the

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 21 of
92

1   day I send this original fax.  This was sent, from the fax

2   header on top, is September 1st, 2002.  So I think I probably

3   received this mark-up copy from him probably within the week

4   after this.

5   Q.  The week after this?

6   A.  Yes.

7   Q.  Did you have any discussions subsequently to that with Mr.

8   Fu regarding the September 1st accounting?

9   A.  I think so, because a lot of the items that he objected to

10  in Exhibit II, I took — I also took them out in the subsequent

11  accountings.

12  Q.  On which subsequent accountings are you referring to?

13  A.  I had a — one spreadsheet that I generate these accountings

14  from, so whenever he makes an objection, sometimes I agree with

15  his objection and sometimes just to avoid any arguments, I just

16  accept his objection and then delete them.  So my one account,

17  one spreadsheet would be updated with incorporating all the

18  objections that he mentioned.

19  Q.  Could you go to Exhibit KK, please?

20  A.  Okay.

21  Q.  Could you tell the Court what Exhibit KK is?

22  A.  It's a — it's a spreadsheet that I put together using my one

23  spreadsheet for the purpose of this trial, to make it more clear

24  to the Court as to how — when my payments were and how were they

25  documented.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 22 of 92

1  Q.  Were there documents that you used to — as a source for

2  Exhibit KK?

3  A.  Yes.

4  Q.  What did you use?

5  A.  I used the same one spreadsheet that I've always kept.

6  Q.  Did you look at any source documents?

7  A.  No.

8  Q.  What about checks?

9  A.  I compared the receipts that I have and payments records I

10 have for each item on this accounting.

11 Q.  On Exhibit KK there's a column called "Method of Payment"?

12 A.  Yes.

13 Q.  What does that column disclose?

14 A.  That disclose either the check number, the canceled check

15 number, or the method of payment, either by credit card or by —

16 Q.  Okay.

17 A.  — or receipts.

18 Q.  And the next column over, it says, "Exhibit Number," and you

19 have various numbers listed in column here.  What are those —

20 what are those references to?

21 A.  I put together all of the proof of payment for every item on

22 this announcing.  And the exhibit number refers to the page on

23 that exhibit, on that receipt exhibit.

24 Q.  Okay.  Can you take a look, just real quickly flip over and

25 look at Exhibit LL?

1   A.   Okay.

2   Q.   Is that the exhibit that you're referring to?

3   A.   Yes.

4   Q.   And the numbers that are referenced in that column are the

5   numbers in the lower right-hand corner?

6   A.   Correct.

7   Q.   So that if somebody wants to verify any particular charge,

8   how do they do this?

9   A.   Just take for example the first item, the payee is G.

10  Cleanup, that's General Cleanup, and the exhibit number is 5.

11  So they would turn in Exhibit LL to page 5, and then there will

12  be the proof of payment for that item.

13  Q.   Okay.

14  A.   Actually page 5 on LL consists of a number of different

15  canceled checks and the first check for this item is on the

16  upper left-hand corner.

17  Q.   Okay.  Now the next column over is the "Purpose"?

18  A.   Purpose is to put down the reason why that item is incurred.

19  Q.   There's two more columns reading across.  One says,

20  "Indicated in fax dated 1-28-02."  The next one is "Indicated in

21  fax dated 9-1-02."  Do you see those columns?

22  A.   Yes.

23  Q.   And can you explain to the Court what the presence or

24  absence of an x in that — in those columns means?

25  A.   The x will indicate that that particular item was also

1  indicated in those fax accounting.  I believe II and JJ — no, HH

2  and JJ.

3  Q.  HH and II.

4  A.  Oh, HH and II, yes.

5  Q.  Okay.

6  A.  And those particular items were also items that were and

7  objected to by Tony Fu in those faxes.

8  Q.  Did you — then, as I understand your testimony, did you not

9  put in things that he objected to in this column?

10  A.  Yes.

11          MR. ROMEO:  All right.  Your Honor, I'd like to move

12  Exhibit KK into evidence.

13          MR. CHU:  I don't see that it's evidence, Your Honor.

14  It's just a summary of — of the evidence contained in LL.

15          THE COURT:  Well, it can be that.

16          MR. ROMEO:  Summaries are admissible.

17          THE COURT:  Summaries are admissible.  He can —

18          MR. CHU:  That — no objection as far as those

19  purposes, Your Honor.

20          THE COURT:  Okay.  It's admitted.

21      (Exhibit KK received in evidence.)

22          MR. ROMEO:  Thank you, Your Honor.

23  BY MR. ROMEO:

24  Q.  I'd also like to — well, let me ask you about Exhibit LL,

25  Mr. Yan.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 25 of 92

1  A.  Yes.

2  Q.  Explain to the Court what Exhibit LL is.

3  A.  LL are all of the proof of payment.

4  Q.  What do you mean by a proof of payment?

5  A.  Basically canceled checks, receipts that has been stamped

6  with "paid" to verify that it has been paid, and also deposits

7  into the BofA account.

8  Q.  What payment are you trying to prove here, payment toward

9  what?

10  A.  Every item that is in Exhibit KK.

11  Q.  Are all of the items in Exhibit KK, do all of them have some

12  back-up in Exhibit LL?

13  A.  Yes.

14  Q.  And what is the total that you paid toward construction-

15  related expenses?

16  A.  The total is 3- — $367,537.

17  Q.  I have a question for you.  With regard to payment of

18  expenses, how were you able to identify what expenses needed to

19  be paid if they weren't paid off the San Francisco Building

20  Professionals account?

21  A.  I'm always directed by Tony as to whom to pay.

22  Q.  So if you had paid, for example, an item, let's take on

23  Exhibit KK, let's look at 10-4-01, Sierra — is that Sierra

24  Lumber?

25  A.  Sierra Point.

1   Q.  Sierra Point Lumber.

2   A.  Yes.

3   Q.  And it says that it was paid by a visa?

4   A.  Yes.

5   Q.  Were you directed by somebody to make that payment?

6   A.  I was told by Tony to pay that.

7   Q.  And did you do that pursuant to his directions?

8   A.  Yes.

9   Q.  Would that be true of all of the expense payments that you —

10  that you have summarized in Exhibit KK?

11  A.  Yes.

12          MR. ROMEO:  Your Honor, I'd like to move Exhibit LL

13  into evidence.

14          THE COURT:  Any objection?

15          MR. CHU:  No objection.

16          THE COURT:  LL is admitted.

17      (Exhibit LL received in evidence.)

18  BY MR. ROMEO:

19  Q.  Now as part of Exhibit LL — or, excuse me — of Exhibit KK,

20  are any — are any of the entries — let me ask a less leading

21  question.

22          Can you look, for example, at the first page of

23  Exhibit KK?

24  A.  Yes.

25  Q.  The entry of 6-7-01 that says, "SFBP"?

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 27 of
92

1    A.   Yes.

2    Q.   What is that?

3    A.   SFBP is the Bank of America account for San Francisco

4    Building Professionals.

5    Q.   What is the $15,000?

6    A.   That's just my deposit into that account.

7    Q.   And where an entry has a payee as SFBP, do all of those

8    indicate simply deposits to that account?

9    A.   Yes.

10   Q.   How much did you deposit in that account?

11   A.   A total of $2,035,000.

12   Q.   And did you ever stop depositing funds into that account?

13   A.   Yes.

14   Q.   When?

15   A.   My last payment, according to my record, was on February 6th

16   of 2002.

17   Q.   And why — was there a reason that you stopped putting money

18   into that account?

19   A.   Because around that time my total contribution to the

20   construction costs was reaching about my limit of $300,000.

21           MR. ROMEO:  Your Honor, I'd also like to move Exhibit

22   PP into evidence at this time.  He's identified those as the

23   bank statements that he obtained for the SFBP account.  They've

24   never been moved in.

25           THE COURT:  Any objection?

1          MR. CHU:  No objection.

2          THE COURT:  PP is admitted.

3        (Exhibit PP received in evidence.)

4   BY MR. ROMEO:

5   Q.  Can you please look at Exhibit RR?

6          THE COURT:  RR?

7          MR. ROMEO:  Yes.

8          THE WITNESS:  Okay.

9   BY MR. ROMEO:

10  Q.  Can you tell the Court what Exhibit RR is?

11  A.  RR are two canceled check copies and the —

12  Q.  Where did you obtain them?

13  A.  The checks belongs to my parents' equity line, and I got it

14  from my parents.

15  Q.  Do these checks have any connection with the Chenery Street

16  project?

17  A.  Yes.

18  Q.  What connection do they have?

19  A.  Tony told me that he needed to pay some contractor for the

20  escape ladders that were installed, and he asked me to prepare

21  two checks to him, each one for $1,000.

22       (Someone sneezes.)

23          MR. ROMEO:  Bless you.

24  BY MR. ROMEO:

25  Q.  And these checks are on your parents' account?

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 29 of 92

1  A.  Yes.

2  Q.  Why are they on your parents account as opposed to your own

3  account?

4  A.  Because my — at the time I was running short on my — on my

5  money.  And at the time when this check was written I had

6  already contributed my — my amount of $300,000 and I was

7  actually paying additional funds toward construction because

8  Tony told me that he — he himself has no money.

9  Q.  Now —

10  A.  So I had to borrow money from my parents.

11  Q.  Now the second page, which is check 1138, is dated 9-26-02.

12  Do you see that?

13  A.  Yes.

14  Q.  At what date did you get these checks from your parents?

15  A.  I obtained both checks on the same date, so probably either

16  on that date or just before that.

17  Q.  The check on the first page, 1137, is actually dated later,

18  at 10-14-02.  Do you see that?

19  A.  Yes.  Yes.

20  Q.  When you obtained these checks from your parents were they

21  completely filled out?

22  A.  No.

23  Q.  What was filled out when you obtained them from your

24  parents?

25  A.  Well, the signature is my father's signatures, but the — the

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 30 of
92

1   amount of "$1,000" on both checks, those are in my handwriting.

2   Q.  Those are in whose handwriting?

3   A.  In my handwriting.  And the date on the check number 1137 is

4   not my handwriting, but the —

5   Q.  Do you — do you —

6   A.  — but the date on the check 1138, the date of September 26,

7   '02, that's my handwriting.

8   Q.  Taking the earlier check first, the one that's made to Anvil

9   Ironworks, that payee, whose handwriting is that?

10  A.  I don't know.

11  Q.  And what about on the memo, "on 663 Chenery"?

12  A.  That's my handwriting.

13  Q.  Do you know if Anvil Ironworks was a vendor to the Chenery

14  project?

15  A.  I have no idea, but subsequently I believe they did the

16  work.

17  Q.  Okay.  Going to the first page, check 1137, which parts of

18  the check are in your handwriting?

19  A.  The "$1,000" in the box in numerical — in numerics and the

20  "one thousand dollars" written in words, those are my

21  handwriting.

22  Q.  Okay.  What about the payee, "Ocwen Federal Bank"?

23  A.  That's not my handwriting.

24  Q.  Do you know whose handwriting that is?

25  A.  I don't know.

Case: 04-33526    Doc# 129    Filed: 06/16/06    Entered: 06/16/06 01:02:47    Page 31 of 92

1   Q.   Do you know what expense the Chenery project was payable to

2   Ocwen Federal Bank?

3   A.   I don't know.

4   Q.   What about the loan number on the memo line?

5   A.   That's not my handwriting.

6   Q.   Do you know whose handwriting it is?

7   A.   I don't, no.

8   Q.   Did you have any — well, you got these through your parents'

9   account, correct?

10  A.   Yes.

11  Q.   Before you got copies back from your parents' account, when

12  was the last time you saw these checks?

13  A.   That was when I handed — hand both of these checks to Tony.

14  Q.   And did either of these checks have the payee information

15  filled in when you handed them to Tony?

16  A.   No.

17  Q.   Did either of them have the memo line filled in when you

18  handed them to Tony?

19  A.   I fill in the memo line for the check number, 1138.

20  Q.   Okay.  Was there any discussion with Mr. Fu as to how the

21  checks would be completed as far as payee?

22  A.   He told me that they were used to pay the vendor who

23  installed the escape ladder — ladder.  So I assume that he was

24  using it to pay that vendor, but at the time I didn't know who

25  the vendor was.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 32 of 92

1          MR. ROMEO:  I'd like to move Exhibit RR into evidence.

2          THE COURT:  Any objection?

3          MR. CHU:  No objection.

4          THE COURT:  Okay.  RR is admitted.

5       (Exhibit RR received in evidence.)

6    BY MR. ROMEO:

7    Q.  Go to Exhibit N- — NN.

8    A.  Okay.

9          MR. CHU:  I'm sorry, counsel, was that N, like in

10   Nancy?

11         MR. ROMEO:  Um-hum.  Yes.

12   BY MR. ROMEO:

13   Q.  Can you tell the Court what Exhibit NN is?

14   A.  I prepared this to summarize the canceled checks from the

15   Bank of America account.

16   Q.  And on the first page of Exhibit NN is a box with various

17   categories.  Do you see that?

18   A.  Yes.

19   Q.  Did you prepare that?

20   A.  Yes.

21   Q.  What is the — what is the total amount of checks summarized

22   on this account?

23   A.  The total is one hundred seven — seventy-one thousand

24   dollars —

25   Q.  No.  At the very top, what — it says "number of checks."

1  A.  Oh, okay.  The number of checks is 173.

2  Q.  Is that true?

3  A.  Yes.

4  Q.  And it says total amount of those checks is 245,853; is that

5  true?

6  A.  Yes.

7  Q.  If you deposited 235,000 into the San Francisco Building

8  Professionals account, do you know where the additional

9  difference came from?

10  A.  I don't know, but I would assume that Tony put those

11  additional amounts in.

12  Q.  Okay.  Now on the box below that information, can you

13  explain to the Court what that is?

14  A.  The box items, I believe, were unauthorized payments from

15  this account.  And I summarized the unauthorized payments

16  according to different payees and the — and the total of the

17  unauthorized payment comes up to $1,071,225.

18  Q.  Okay.  Let me ask you, first of all, when you talk about the

19  payments to Ming Fong, does that — does that total reflect the

20  three checks that we have marked and discussed in this trial?

21  A.  Yes.

22  Q.  And that are a part of Exhibit MM?

23  A.  Yes.

24  Q.  With respect to those payments to Tony Fu, is that the total

25  of the six checks that we've marked and had testimony about in

1  this trial that are in the amount of $9,000 each to Mr. Fong?

2  A.  Yes.  And plus there's also, I believe, a check made out to

3  cash that Tony Fu endorsed subsequently for $500.

4  Q.  Okay.  And then the payments to Toyota is a summary of

5  checks 165 and 166 shown in Exhibit MM?

6  A.  Yes.

7  Q.  And you heard me go through yesterday the various checks

8  that were — that Mr. Fu testified about were to his credit

9  cards?

10  A.  Yes.

11  Q.  Does that figure correspond to the checks for those credit

12  cards?

13  A.  Yes.

14  Q.  What about the payments to GMAC; what does that indicate?

15  A.  Well, GMAC, I believe — it appears that they are car

16  payments.  And if they are for car payments, then they are

17  unauthorized payments.

18  Q.  What about — did you — did you agree that Mr. Fu's car

19  payments could be part of construction costs in your $300,000

20  contribution?

21  A.  No.

22  Q.  Did you agree that Mr. Fu could pay his personal credit

23  cards off the construction costs that you were to pay?

24  A.  No.

25  Q.  Did you — did you agree to buy Mr. Fu a new truck out of

Case: 04-33526    Doc# 129    Filed: 06/16/06    Entered: 06/16/06 01:02:47    Page 35 of
92

1   your $300,000 contribution?

2   A.  No.

3   Q.  You heard Mr. Fu testify today that you went with him to San

4   Francisco Toyota for the purpose of negotiating the purchase of

5   a Toyota Tundra truck; do you recall that testimony?

6   A.  Yes, I recall his testimony.

7   Q.  Did — did such an event happen?

8   A.  No.

9   Q.  Did you ever go shopping for trucks with Mr. Fu?

10  A.  No.

11  Q.  Did you know before you got the checks from the bank that

12  Mr. Fu had purchased a truck off the San Francisco Building

13  Professionals account?

14  A.  No.

15  Q.  Did you know that Ming Fong had been paid $80,000 of the San

16  Francisco Building Professionals account before you go that the

17  checks from the bank?

18  A.  No.

19  Q.  Did you know that Mr. Fu was paying personal credit card

20  expenses off the San Francisco Building Professionals account

21  before you got the checks from the bank?

22  A.  No.

23  Q.  Can you explain to me on the next line what's the payments

24  to phone supposed to be?

25  A.  There were quite a few of the canceled checks for phones.

Case: 04-33526    Doc# 129    Filed: 06/16/06    Entered: 06/16/06 01:02:47    Page 36 of 92

1   Some were in small amounts.  That appears to be monthly service

2   fees.  And some seems to be quite large amounts for, I don't

3   know, for buying new phones.  But if they are payments for phone

4   then are unauthorized.

5   Q.  And why do you say that they're unauthorized?

6   A.  Has no relationship to the purpose of this checking account.

7   Q.  What about payments to SFAR, what does that mean?

8   A.  SFAR is — stands for San Francisco Association of Realtor.

9   And there were a number of checks in there that appears to be

10  payments for membership to this organization.

11  Q.  Was payments for membership in the San Francisco Association

12  of Realtors part of the construction costs on Chenery?

13  A.  No.

14          MR. ROMEO:  Your Honor, I'd like to move Exhibit NN

15  into evidence.

16          MR. CHU:  No objection.

17          THE COURT:  NN is admitted.

18      (Exhibit NN received in evidence.)

19  BY MR. ROMEO:

20  Q.  Going to the next exhibit, Exhibit OO.

21  A.  Okay.

22  Q.  Does Exhibit OO list the same checks that are listed in

23  Exhibit NN?

24  A.  Yes.

25  Q.  How is the listing different?

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 37 of 92

1  A.  The exhibit in NN were listed numerically with the check

2  number.  And Exhibit OO is the same entries were sorted by type,

3  by payee type.

4  Q.  Okay.

5  A.  Excuse me.  By the type of the payment.

6  Q.  Okay.

7  A.  Yeah.

8        MR. ROMEO:  Your Honor, I'd like to move Exhibit OO

9  into evidence.

10       MR. CHU:  No objection.

11       THE COURT:  OO is admitted.

12    (Exhibit OO received in evidence.)

13  BY MR. ROMEO:

14  Q.  Mr. Yan, I'd like you to turn to Exhibit MM, the canceled

15  checks from the bank.

16  A.  Yes.

17  Q.  In this exhibit are there checks payable in the amount of

18  $9,000 to Mr. Y- — to Mr. Fu?

19  A.  Yes.

20  Q.  And how many checks are there?

21  A.  I —

22  Q.  In that amount.

23  A.  I believe there are six checks.

24  Q.  And so the total of those checks is what?

25  A.  That would be $54,000.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 38 of 92

1    Q.   You heard Mr. Fu's testimony regarding four of those checks

2    being a compensation to him for profit on a property on Majestic

3    Avenue?

4    A.   Yes, I heard his testimony.

5    Q.   First of all, did you — did you ever have any ownership

6    interest in a — in a property on Majestic?

7    A.   Yes.  I own a property at — at that address.

8    Q.   Do you know what address it is?

9    A.   190 Majestic.

10   Q.   And what kind of a property is it?

11   A.   It was a unimproved lot.

12   Q.   An unimproved lot?

13   A.   Yes.

14   Q.   And when did you — when did you acquire an ownership

15   interest in it?

16   A.   I believe I bought that in 1998.

17   Q.   How did you pay for it?

18   A.   I think I paid cash for it.

19   Q.   Did you take title to that property?

20   A.   Yes.

21   Q.   Did you take title to the property with anybody else or did

22   you have title alone?

23   A.   I'm the sole owner of the property.

24   Q.   Did Tony Fu ever have any involvement in that property?

25   A.   We — when I bought the property I asked Tony to help me to

Case: 04-33526    Doc# 129    Filed: 06/16/06    Entered: 06/16/06 01:02:47    Page 39 of 92

1  obtain a permit to build a single family house on that property.

2  Q.  And when you asked Mr. Fu to help you obtain the permit to

3  build a single family house on that property, how did he

4  respond?

5  A.  Oh, he agreed.

6  Q.  Did he actually undertake that assignment?

7  A.  Yes.

8  Q.  And do you — and what did he do specific to that assignment?

9  A.  At that time I wasn't quick familiar with the construction

10 process, but I believe what he did was that he hired some

11 engineer to prepare the plans.  And then he help me submit the

12 plans to the building department.

13 Q.  Did you have an agreement with Mr. Fu to compensate him in

14 some fashion for his assistance in obtaining a permit for a

15 single family dwelling?

16 A.  Yes.  I think we — I think we had the original agreement,

17 but I don't have that agreement anymore, and basically the

18 agreement was that he will build a house for me.  And as

19 compensation for his work as the contractor I will pay him a

20 certain amount.  I don't recall what the amount was.

21 Q.  All right.  Do you still own Majestic — 190 Majestic Avenue?

22 A.  No.

23 Q.  Did you sell it?

24 A.  Yes.

25 Q.  When did you sell it?

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 40 of 92

A. I sold it, I believe, in 1999 or — or maybe early 2000, I'm not sure, but around that timeframe.

Q. And let me ask you this. Can you take a look at Exhibit SS?

A. Okay.

Q. Did you pay Mr. Fu compensation for assisting you in getting a permit for that lot?

A. Yes.

Q. What is Exhibit SS?

A. SS is the payment I pay to Tony after we decide not to continue with the project. And I decide to sell the empty lot with the permit. And this is compensation for his work.

Q. What's the date on the check?

A. June 1st, 1999.

Q. And on the memo line on the check, can you tell the Court what that says?

A. It says in my shorthand writing, it stands for: Professional fee, dash, 490 Majestic Avenue.

Q. Okay. I thought you told me the address was 190?

A. No. It's 490.

Q. Okay. So it's 490 Majestic Avenue?

A. Yes.

Q. And did you have an agreement with Mr. Fu to pay him any other compensation other than this check for $13,000?

A. No.

Q. Did you owe Mr. Fu any money for Majestic Avenue in 2001 or



Case: 04-33526 Doc# 129 Filed: 06/16/06 Entered: 06/16/06 01:02:47 Page 41 of 92

1  2002?

2  A.   No.

3  Q.   After you sold Majestic Avenue what is the first time that

4  you ever heard Mr. Fu make a request or make a claim that he was

5  owed money on this deal on Majestic Avenue?

6  A.   The first time I saw his claim according — Majestic is in

7  the, what, June of this year, 2005, in a filing date filed with

8  this Court.

9  Q.   And if you could look at Exhibit III?

10 A.   Okay.

11 Q.   And you're referring to the assignment of proof of claim?

12 A.   Yes.

13 Q.   And you're referring to paragraph 14?

14 A.   Yes.

15 Q.   And had you attended by the date this was filed a session of

16 Mr. Fu's deposition?

17 A.   Yes.

18 Q.   And Mr. Fu testified at that point about this Majestic

19 Avenue deal?

20 A.   Yes.

21 Q.   So between 1999, June 1999, when you paid Mr. Fu $13,000 for

22 his efforts on Majestic Avenue, and the litigation — or up until

23 the litigation in June of 2005, did Mr. Fu ever make any kind of

24 demand or comment or claim to you that he was owed money for

25 Majestic Avenue?

1    A.  No.

2    Q.  Now before you entered into the contract with Mr. Fu, let me

3    ask you, first of all:  The contract of October 18th, 2000, who

4    wrote that?  Who was the draftsman?

5    A.  I drafted it with input from Tony.

6    Q.  All right.  There was a prior draft of that agreement.  You

7    recall that we marked that in the first phase of the trial?

8    A.  Yes.

9    Q.  And did — did the two of you have an understanding about the

10   term "construction costs"?

11   A.  Yes.

12   Q.  And what was — what was considered — or what was your

13   understanding as far as what a construction cost was?

14   A.  The construction cost was the actual material cost plus any

15   worker's salary and payment to subcontractors.  And it doesn't

16   include any — any salary or profit for Tony for his role as the

17   contractor.

18   Q.  Did it include any professional fees for architects or

19   lawyers, or anything like t?

20   A.  No.

21   Q.  Did you pay those separately?

22   A.  Yes.

23   Q.  Did — and, as I understand the agreement, it expressly

24   provides that those are your sole responsibilities; is that

25   true?

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 43 of
92

1  A.  Yes.

2  Q.  And did you in fact pay all of those expenses?

3  A.  Yes.

4  Q.  Can you look at Exhibit JJ?

5  A.  Okay.

6  Q.  On Exhibit — can you tell the Court what Exhibit JJ is?

7  A.  JJ is my accounting of the money I paid toward the

8  permit-related expenses for this project at Chenery Street.

9  Q.  And are these expenses that under your contract with Mr. Fu

10  were supposed to be your sole responsibility?

11  A.  Yes.

12  Q.  Is this accounting or summary of the expenses incurred under

13  that category accurate?

14  A.  Yes.

15          MR. ROMEO:  I'd like to move Exhibit JJ into evidence.

16          THE COURT:  Any objection?

17          MR. CHU:  No.  No objection.

18          THE COURT:  Okay.  JJ is admitted.

19      (Exhibit JJ received in evidence.)

20          MR. ROMEO:  Did we admit Exhibit SS?  I'm not sure.

21  If not I'd like to move Exhibit SS into evidence.  It's the

22  $13,000 payment.

23          THE COURT:  SS?

24          MR. ROMEO:  Yeah.  It's the $13,000 payment of June

25  1st, 1999 to Mr. Fu.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 44 of
92

1          THE COURT:  Any objection?

2          MR. CHU:  No objection.

3          THE COURT:  SS is admitted.

4       (Exhibit SS received in evidence.)

5    BY MR. ROMEO:

6    Q.  Now before you entered that contract of October 18th, 2000

7    with Mr. — Mr. Fu, did you have any understanding of what sort

8    of materials were going to be put into the project?

9    A.  Besides the basic building material, like lumber or

10   concrete, et cetera, he also told me that he will put in average

11   quality — how do I say it — like, for example, the appliances or

12   the bathroom fixtures, or lighting fixtures or the flooring, to

13   finish the flooring.  He told me — he told me that he will put

14   in the average quality or average-cost material for that — for

15   those.

16   Q.  Okay.  When the — when the project was finished in 2003 were

17   you familiar with the as-built condition of the property?

18   A.  Yes.

19   Q.  Were you familiar with the finishes and materials that were

20   used in the four units of the property?

21   A.  Yes.

22   Q.  In regard to Exhibit — this morning I was asking Mr. Fu

23   about Brazilian cherrywood and so forth, those types of lumbers.

24   Do you remember if there was any Brazilian cherrywood used in

25   that — that project?

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 45 of 92

1   A.  No.

2   Q.  Do you recall if there was any maple stairs or risers used

3   in that project?

4   A.  No.

5   Q.  Did you agree to buy Mr. Fu tools that he could keep after

6   the project as part of the contribution to the Chenery project?

7   A.  No.

8   Q.  Do you have Exhibit 119 in front of you, Mr. Yan?

9   A.  Yes.

10  Q.  Still there?

11  A.  Yes.

12  Q.  This was something that was marked yesterday in the

13  testimony of Mr. Fu?

14  A.  Yes.

15  Q.  Are you familiar with this document?

16  A.  Yes.

17  Q.  Did you engage this person, Mr. Tapp, to provide a

18  projection?

19  A.  Yes.

20  Q.  Is that what this is supposed to be?

21  A.  He was a licensed architect.  And at the time I hired him to

22  come up with some suggestions as to the — the new building plan.

23  Q.  And looking at page 2 of Exhibit 119, first of all, do you

24  understand this document?

25  A.  Yes.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 46 of 92

1  Q.  Can you tell me on page 2 what the column means under total

2  under "New" in the first set of columns in the middle of the

3  page, the square footage?

4  A.  Yes.  The size?

5  Q.  Yes.

6  A.  Okay.  The column designated as new, those will be the

7  square footage of the new — of the new proposed building.

8  Q.  Okay.  And in the column that's marked, "Existing," is that

9  to your mind an accurate figure for the existing building at 663

10 Chenery?

11 A.  Yes, I believe so.

12 Q.  Okay.  So you understood this to be the square footage of

13 the project?

14 A.  Yes.

15 Q.  And on page 3, this is a different — is this —

16 A.  Well, let me — let me comment that this is the square

17 footage of the proposal by Richard Tapp, but this is not the

18 actual building plan that was built.

19 Q.  Okay.  I was going to ask you about that, but —

20 A.  Okay.

21 Q.  — and the same thing with regard to page 2, where it says

22 "New square footage," the same column?

23 A.  Yes.  This is the square footage of another conceptual plan

24 that Richard Tapp came up.

25 Q.  Now was the Chenery project actually built in conformity

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 47 of
92

1   with Mr. Tapp's projections here?

2   A.   No, it was different.

3   Q.   Do you have the exhibits from the first phase of the trial

4   here?

5           Can you take a look at Exhibit 22, the fourth page of

6   the exhibit?

7   A.   Okay.

8   Q.   Have you found the page?

9   A.   Yes.

10  Q.   What is that page?

11  A.   This was a part of the parcel — parcel map that was prepared

12  by the surveyor, Frederick Seaher (phonetic), and this was the

13  parcel map that was recorded at the City.

14  Q.   Okay.  Do you see a table on the map?

15  A.   Yes.

16  Q.   And can you read off to the Court, because it's a little

17  small, but can you — it has a, first of all, commercial space

18  under unit number; do you see that?

19  A.   Yes.  Yes.

20  Q.   And then it has a unit number and a lot number?

21  A.   Yes.

22  Q.   1, 2, and 3 with, respectively, lot numbers 36, 37, 38, and

23  39, correct?

24  A.   Yes.

25  Q.   Reading from top to bottom can you first tell us the

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 48 of
92

1   addresses for the — the address for the commercial space?

2   A.  The commercial space, the street address number is 661

3   Chenery Street.

4   Q.  Okay.  And for purposes of the parcel map, unit number 1 is

5   what street address?

6   A.  That should be 70 Wilder Street (phonetic).

7   Q.  And unit number 2, —

8   A.  That would be —

9   Q.  — also referred to as lot 38, what street address is that?

10  A.  That's 663 Chenery.

11  Q.  And unit number 3, lot number 39, what street address is

12  that?

13  A.  That would be 665 Chenery.

14  Q.  Okay.  So I would understand the last three to be the

15  residential units?

16  A.  Yes.

17  Q.  And then the last column in the table, can you read from top

18  to bottom starting with the commercial space, what the square

19  footage is indicated on the parcel map?

20  A.  Yes.  For the commercial units, the square footage is 1,094,

21  I believe.  And for units 1, which would be 70 Wilder, the

22  square footage is 1288.  And for unit number 2 the square

23  footage is 1135.

24  Q.  And that's 663?

25  A.  That's 663.  And the last one, unit number 3, that's 665

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 49 of 92

1   Chenery Street, the square footage is 986.

2   Q.  And so that totals to about how much square footage?

3   A.  I would say roughly about 4,500, that range.

4   Q.  Is it — was the Chenery Street a 9,000-square-foot building,

5   such as Mr. Fu repeatedly testified?

6   A.  I don't think so.

7   Q.  On October 18th, 2000, when you executed that agreement,

8   Exhibit D with Mr. Fu, did you have an ownership interest in 663

9   Chenery Street?

10  A.  Yes, I'm the sole owner.

11  Q.  And when did you buy 663 Chenery Street?

12  A.  I bought it from the previous — the previous owner, Winky

13  Wong, I believe in October of 2000.

14  Q.  And I think the last time in Phase 1 of this trial we had a

15  discussion about there was a written agreement between you and

16  Mr. Fu and Ms. — and Mr. Wong about the development of that

17  project?

18  A.  Yes.

19  Q.  And that agreement was canceled?

20  A.  Yes.

21  Q.  And was it canceled in connection with your purchasing the

22  property from Mr. — Mr. Wong?

23  A.  Yes.  It was canceled because we haven't started to execute

24  that agreement and also because I bought out Winky Wong's

25  ownership of the property.  We decided to cancel the original

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 50 of 92

1   agreement between the three of us.

2   Q.  So as of the date that you entered into your contract with

3   Mr. Fu, who owned the property in record title?

4   A.  I was the owner.

5   Q.  Sole owner?

6   A.  The sole owner.

7   Q.  Can you look at look at Exhibit JJJ?

8   A.  Okay.

9   Q.  Can you tell the Court what Exhibit JJJ is?

10  A.  It's the contract for sale between me and Mr. Winky Wong.

11  Q.  And was this the contract by which you acquired title to 663

12  Chenery Street?

13  A.  Yes.

14  Q.  And these are the terms that you — the financial terms in

15  the Section 1 are the actual financial terms that you made the

16  purchase on?

17  A.  Yes.

18  Q.  Did you take title to the property subject to any loans?

19  A.  Yes.

20  Q.  So if I understand these financial terms correctly, did you

21  make an initial deposit of 150,000?

22  A.  Yes.

23  Q.  And then you made an additional deposit of 50,000?

24  A.  Yes.

25  Q.  And then paid an additional 82,320 —

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 51 of 92

1  A.  Yes.

2  Q.  — through — through escrow?

3  A.  Yes.

4  Q.  Was this transaction done through an escrow?

5  A.  No.

6  Q.  Okay.

7          MR. CHU:  Pardon me, counsel.  Did you just say

8  Exhibit JJJ?

9          MR. ROMEO:  Yeah.  Oh, mine is mismarked as KKK, a

10  terrible number.

11          MR. CHU:  Is it K or J?

12          MR. ROMEO:  JJ.  J.

13          MR. CHU:  Just J, okay.

14          THE COURT:  I don't have a KKK.

15          MR. CHU:  I —

16          MR. ROMEO:  You should have a JJJ.

17          THE COURT:  I do have a JJJ, yeah.

18          MR. CHU:  My KKK was mismarked.  It should have been

19  JJJ, so.

20          MR. ROMEO:  Yeah.  I apologize, Mr. Chu.

21          MR. CHU:  I corrected it.

22  BY MR. ROMEO:

23  Q.  And then you — did you assume existing financing of Mr.

24  Wong's on the property?

25  A.  Yes.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 52 of
92

1  Q.  Is this an accurate figure for the balances that you took —

2  took subject to?

3  A.  Yes.

4  Q.  Did you assume these loans or did you just take subject to

5  in the purchase; do you know the difference?

6  A.  Take subject to.

7  Q.  Okay.  Does that mean that — did you make payments directly

8  to the lenders that had loans on the property?

9  A.  I think initially after this purchase agreement was entered

10  into, Winky Wong was making the payments and then we reimbursed

11  Winky.  But eventually I began to make payments to the — to the

12  banks.

13  Q.  Okay.  And so there was two loans totaling $455,680 on the

14  property at this time?

15  A.  Yes.

16  Q.  And did you continue to make the mortgage payments —

17  A.  Yes.

18  Q.  — on those loans?

19  A.  Yes.

20  Q.  And there's two loans, correct?

21  A.  Yes.

22  Q.  One to World Savings?

23  A.  Yes.

24  Q.  And one to Bank of America?

25  A.  Yes.

1  Q.  Are those loans still on the property?

2  A.  No.

3  Q.  When did they stop being on the property?

4  A.  I paid them off, I believe, end of 2003, probably around, I

5  forgot, part — December timeframe.

6  Q.  Would you look at Plaintiffs' Exhibit 21.  Do you recall in

7  Phase 1 submitting a Fidelity Title report from 2003 to your

8  surveyor?

9  A.  Yes.

10  Q.  And you testified about this in the last — in the first

11  phase of the trial?

12  A.  Yes.

13  Q.  Can you go to the preliminary report on page 3?

14  A.  Yes.  On the page 3 of this exhibit I've — in item number 4

15  I put in the margins, it says, "Pay off as of December 1st,

16  '03."

17  Q.  Going to the next page of the preliminary title report.

18  A.  On page 4 of this exhibit in item number 5 also on the

19  margin I put down the payoff as of December 1st, '03.

20  Q.  Did you ever — did you have any units on the market in 2003?

21  A.  Yes.

22  Q.  And that would have been 661 Chenery Street?

23  A.  I believe I had all of them on the market or listed on the

24  market.

25  Q.  Do you remember in the first phase of the trial we were

1  talking about a Santiesteban escrow?

2  A.  Yes.

3  Q.  And that was for 661 Chenery?

4  A.  Yes.

5  Q.  And so were these paid off while that escrow was pending?

6  A.  Yes.

7  Q.  And what was the approximate loan balance that you paid off?

8  A.  I think around $450,000.

9  Q.  And where did you get the funds to do that?

10  A.  I got the funds by refinancing my other property at 547

11  Twenty-Third Avenue.

12  Q.  And as the Washington Mutual loan that you talked about in

13  the last phase of the trial?

14  A.  Yes.

15        THE COURT:  Which property?

16        MR. CHU:  That's 547 Twenty-Third Avenue.

17  BY MR. ROMEO:

18  Q.  And what was your reason for paying off those loans in 2003?

19  A.  Because we needed to have the assisting bank lenders on this

20  property sign off on the condo maps and they were slow in

21  responding.  So I just decided to pay them off.

22  Q.  And so the — was there a subdivision map eventually recorded

23  on the property?

24  A.  Yes.

25  Q.  And whose signatures were needed at the time that it was

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 55 of 92

1   recorded for approval?

2   A.  Besides the bank's, who did not respond, because I intended

3   to pay them off of course the bank lender's were not on it, but

4   on the final condo map I had to get Stella Chen, Tony's sister,

5   and also Li Ming Lei (phonetic), Tony's ex-wife's signature on

6   those.

7   Q.  All right.  So those are the only quote-unquote lender

8   signatures for the — on the subdivision map that was recorded?

9   A.  Yes.

10  Q.  And that was the subdivision map that Mr. Farrer introduced

11  into evidence in the first phase of the trial?

12  A.  Yes.

13  Q.  Okay.  During the — during what period of time did you make

14  the mortgage payments to Bank of America and to World Savings on

15  the Chenery property?

16  A.  Beginning from the purchase from Winky Wong, this is in

17  October 2000, to December of 2003, when I pay off those loans.

18  Q.  Okay.  And do you know what the total of those mortgage

19  payments were?

20  A.  That would be a total of 30- — 33 months.

21  Q.  And what does that total out to?

22  A.  That comes out to be about close to $90,000.

23  Q.  During that same period of time did you also pay the

24  property taxes on the Chenery Street property?

25  A.  Yes.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 56 of
92

1    Q.  Do you know, was there any agreement between you and Mr. Fu

2    about the payment of property taxes on the property?

3    A.  No.  I —

4    Q.  Were there ever any discussions between you and Mr. Fu about

5    payment of property taxes while the Chenery project was being

6    constructed — or sold?

7    A.  Right after I bought the property from Mr. Winky Wong I

8    began to make payments for the tax myself and then subsequently

9    because of the delay in the construction, I did ask Tony to

10   contribute to part of the taxes, but —

11   Q.  Did Mr. Fu agree to contribute toward part of the taxes —

12   A.  No, he refused.  And he told me that that's not his

13   responsibility because he is not the owner.

14   Q.  How much did you pay towards property taxes on the Chenery

15   Street property between the time you acquired it from Mr. Wong

16   in October 2000 and the date that the properties were sold as

17   condo units?

18   A.  I think, let me see, I think that the tax bill for each year

19   is around like 5,000 or $6,000.  And from 2000 to, I would say,

20   end — to April of 2004, when the properties — properties were

21   sold, so I had the property maybe in my possession for, what,

22   like three or four years.  So I would say my total tax payments

23   were around maybe $30,000 or $36,000.  Oh, excuse me.  That

24   would be — no, I would say around $20,000 would be my total tax

25   payments.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 57 of
92

1              MR. ROMEO:  I'd like to offer another exhibit and I'd

2     like to mark this one as Exhibit KKK.  It's a two-page exhibit.

3              Your Honor.

4              THE COURT:  Yes.  Is it marked?

5              MR. ROMEO:  I will mark it.

6              THE COURT:  I can mark it.  That's fine.

7     BY MR. ROMEO:

8     Q.  Okay.  The first page — or second page of Exhibit KKK is

9     what, Mr. Yan?

10    A.  This is a page that I produced to account for my payments

11    toward taxes and the general maintenance expenses for this

12    project at Chenery.

13    Q.  Okay.  Is this a summary of the tax payments on the

14    property?

15    A.  This also includes the tax payments I made.

16    Q.  Okay.  And what is the source of this summary?

17    A.  I had a running account of my total expenses.  And also this

18    would correspond to the receipts that I have.

19    Q.  Okay.  So this summary is based on those receipts?

20    A.  Yes.

21    Q.  And does it accurately summarize the amounts that you paid

22    towards taxes and maintenance on the property.

23    Q.  Can you — going to the first page then, can you explain to

24    the Court what that summary is?

25    A.  Page 1 of Exhibit KKK is my summary of my overall total

1   contribution for Chenery Street, pretty much every dollar that I

2   put into this project.

3   Q.  All right.  The first line of that where it says,

4   "Purchases," the 738,000, which was paid to Mr. Wong?

5   A.  Yes.

6   Q.  And then what is the second line?

7   A.  The second line is the mortgage payment for those existing

8   loans on the project and the amount comes out to be about

9   $89,000 and $100.

10  Q.  Eighty-nine thousand one hundred dollars?

11  A.  Yes, 89,- and — $89,100.  Yeah.

12  Q.  And the reference to permits is what?

13  A.  "Permit" is the permit expenses that I was responsible for

14  outside of the construction fee.  And that comes out to be a

15  little bit over $34,000.

16  Q.  All right.  And then the line maintenance, what does that

17  refer to?

18  A.  That would include the taxes, insurance, and utilities on

19  the project.

20  Q.  And is that the taxes, insurance, and utilities that's on —

21  that's summarized on the second page?

22  A.  Yes.

23  Q.  And then the final one, "Construction," what's that figure

24  from?

25  A.  That's the — my total contribution toward construction.  And

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 59 of 92

1    that comes out to over $367,000.

2    Q.  Is that — is that a reference to the same $367,000 that you

3    had summarized in Exhibit KK that's been admitted into evidence?

4    A.  Yes.

5             MR. ROMEO:  All right.  Your Honor, this might be a

6    good time to take a break.  We're at about mid-afternoon.

7             THE COURT:  That's fine.

8             MR. ROMEO:  We're probably done, but it would be

9    helpful if I could review my notes and maybe have a word with my

10   client to see if there is anything else we want to present on

11   direct.

12            THE COURT:  Okay.  Shall we take ten minutes; is that

13   suitable?

14            MR. CHU:  Yes.

15            THE COURT:  Great.  Thank you.

16            MR. ROMEO:  Thank you, Your Honor.

17            THE CLERK:  All rise.

18       (Recess taken from 2:55 p.m. to 3:13 p.m.)

19            THE COURT:  Please be seated.

20   BY MR. ROMEO:

21   Q.  Mr. Yan, if you could open the exhibit book from Phase 1 to

22   Exhibit D to look at the — not the plaintiffs' — do I have it

23   here?  Oh, maybe look at that.

24            I want you to look at the contract again real quickly,

25   Exhibit D.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 60 of 92

1   A.   Okay.

2   Q.   And if I could just read over your shoulder here for a

3   minute.

4           With regard to paragraph 3, it says, "The said

5   property is either up for sale or rent.  The proceeds shall

6   distribute according to the ownership percentage."

7           That particular provisions, what — was there an

8   understanding between you and Mr. Fu as to what were the

9   proceeds?

10  A.   I don't think we were quite definite, because this agreement

11  was drafted by me and with Tony's input.  And, frankly, it's

12  just very informal.  I don't think we ever put much thought into

13  the legal meaning of the word "proceeds."

14  Q.   Does that — are you familiar with the term "seller's

15  proceeds"?

16  A.   Yes.

17  Q.   Would that be the equivalent of seller's proceeds?

18  A.   That would be.  Then that's after — then that's of the sales

19  price minus any existing encumbrance on the property and closing

20  costs.

21  Q.   Is that what the term "proceeds" means in the case of this

22  contract?

23  A.   I — honestly — honestly speaking, I don't think we would

24  define what — what that meant.

25  Q.   Okay.  So you didn't discuss it one way or the other?

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 61 of
92

1  A.  No.

2  Q.  But you didn't specifically exclude payment of — in other

3  words, the mortgages were not solely your responsibility, there

4  wasn't a provision for that as Mr. Fu testified?

5  A.  My understanding was that this agreement is really a

6  construction agreement and Tony's compensation from this

7  agreement was as a contractor.  So my understanding is that my

8  being the owner, I was responsible for the mortgage payments

9  myself.

10  Q.  Okay.  But I know what your understanding is, but what was

11  the understanding between you and Tony?  Was the understanding

12  between you and Tony, as you said, a construction contract?

13  A.  Oh, yes.

14  Q.  Would you have entered into this contract with Mr. Fu had

15  you known he wasn't going to be licensed during the

16  construction?

17  A.  I would not have entered into the agreement with him.

18  Q.  Did you enter into the contract in reliance upon him having

19  a contractor's license?

20  A.  Yes.

21  Q.  Why was that important?

22  A.  Because I know for a project this size, it needs to be done

23  under a licensed' contractor's name.  And I wasn't a licensed

24  contractor.  And if Tony wasn't a licensed contractor I would

25  not have hired him.  I would have hired someone else.

1  Q.  Was — this was going to be a four-unit project, correct?

2  A.  Yes.

3  Q.  And was it always intended that the property would be done

4  as a commercial venture as opposed to your own personal

5  residence?

6  A.  The idea was that it would be sold and I would say that the

7  understanding was that it — it would be sold after its

8  completion.

9  Q.  Is that what — is that what the intent is behind Exhibit 3,

10  your mutual intent, or —

11  A.  Item number 3?

12  Q.  Provision number 3 —

13  A.  Yes.

14  Q.  — in the — okay.  Okay.

15        Did Tony and you ever have discussions about side

16  deals and change orders?

17  A.  No.  We never entered into any agreements on any side

18  orders.

19  Q.  Did — did you have discussions about him seeking addition —

20  your sharing additional expense for the construction?

21  A.  He did during construction make some request to me for

22  additional payments to him, which he claims were change orders.

23  Q.  You heard his testimony this morning about what he referred

24  to as change orders and side deals —

25  A.  Yes, I did.  Yes.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 63 of 92

1  Q.  Did those — did those issues come up between you?

2  A.  Yes.

3  Q.  Did you pay additional costs in response to his requests?

4  A.  No.  I refused to pay him for those, what he terms change

5  orders, because I felt that it was not legitimate because under

6  our agreement he was supposed to bill the project according to

7  the plan.  And what he terms by change orders or side — side

8  agreement —

9  Q.  Side deal?

10  A.  — side deals was really what is required of him to do in the

11  original agreement, anyways.

12  Q.  Did — was there ever concern at some time during the project

13  that you were running out of funds to do it?

14  A.  Yes.

15  Q.  When was that?

16  A.  I would say toward the end of the main phase of the

17  construction.  This is in middle of 2002 or early 2002, there is

18  some arguments between Tony and myself about who was supposed to

19  come up with the extra money for completion.

20  Q.  According to your exhibit KK and LL you did come up with

21  additional funding; is that true?

22  A.  Yes.

23  Q.  You paid an additional $67,537?

24  A.  Yes.

25  Q.  Why did you do that?

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 64 of
92

1    A.  I have no choice because even though I informed Tony that

2    it's now time for him to take over the construction costs, he

3    told me that he just stuck the money in the Bank of America

4    account and that he himself didn't have any money to contribute.

5    So I have no choice but to come up with extra money.

6             MR. ROMEO:  All right.  I have no further questions,

7    Your Honor.

8             THE COURT:  Cross-examine.

9             MR. CHU:  Yes.  Thank you, Your Honor.

10                     <u>CROSS-EXAMINATION</u>

11   BY MR. CHU:

12   Q.  When you entered into the agreement with Tony Fu, and I'm

13   referring to the one you just talked about, Exhibit D, —

14   A.  Yes.

15   Q.  — you entered into it in reliance of Tony being a licensed

16   contractor, correct, —

17   A.  Yes.

18   Q.  — is that what you just said?  Yes?

19   A.  Yes.

20   Q.  And also the — the fact that he was going to be responsible

21   for constructing the project?

22   A.  Yes.

23   Q.  But there's nothing in the agreement that requires him to be

24   the contractor on the property, is there?

25   A.  Well, in all of my previous deals with him on all my other

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 65 of
92

1   projects, he worked on those projects as the general contractor.

2   And because this is an informal agreement between us, a lot of

3   things that's obvious between us weren't included.  And one of

4   the obvious thing is that his responsibility was to be as the

5   contractor.

6   Q.  When you say it's an informal agreement, what are you

7   saying, that this agreement doesn't — doesn't count or —

8   A.  No.  I'm just saying that it's not drafted by the lawyer, so

9   I would say that — and it's really just a agreement between the

10  two good friends at the time.  So the fact that he was the

11  licensed contractor and that's what his job is, it's really

12  obvious between us.  So I think — I think included this wording

13  in this contract.

14  Q.  But under this agreement there was nothing to prevent Mr. Fu

15  from going out and hiring a licensed contractor to do the

16  project, correct?

17  A.  I would say that would be correct, but then that would

18  defeat my purpose of hiring Tony.  If that's the case then I

19  could hire a licensed contractor directly.

20  Q.  Now if Tony — if Tony were to have gone out and hired a

21  licensed contractor and paid all the money required, he still

22  would have complied with the agreement, correct?

23  A.  Like I said, that would not be the spirit of our agreement

24  because in that case why would I need to hire Tony.  I can hire

25  the other contractor directly.

1  Q.  Let me go back to your testimony on Exhibit 22, which was

2  the parcel map.

3  A.  Okay.

4  Q.  With — with the various square footages for each of the

5  individual units.

6  A.  Yes.

7  Q.  Now those — those square footages didn't include square

8  footage for the common areas, did it?  Those were just the units

9  themselves?

10  A.  I believe that's correct.

11  Q.  And it didn't include square footages for the garage that

12  was included?

13  A.  I believe so.

14  Q.  Okay.  Now the budget that was prepared for you by Mr. Tapp,

15  Exhibit 119, —

16  A.  Yes.

17  Q.  — was a budget that included the costs to construct the

18  entire project, including the common areas and the garage,

19  correct?

20        MR. ROMEO:  Objection.  Mischaracterizes the exhibit

21  and the testimony.  Mr. Yan's testimony was that the project as

22  built does not conform to Mr. Tapp's projection.  They're

23  radically different projects and therefore it's just not

24  relevant.  It's not a relevant line of questioning at all.

25        MR. CHU:  I — I can rephrase my question, Your Honor.

1           THE COURT:  Go ahead.

2    BY MR. CHU:

3    Q.  The project that Mr. Tapp budgeted for you was a project

4    that included a budget for the common areas and a garage space

5    in the — in the project that he contemplated, was it — was it

6    not?

7           MR. ROMEO:  I have to make the same objection.  He's

8    already testified that Tapp's proposal doesn't match the —

9           THE COURT:  What — I just wonder what the relevance of

10   this is?

11          MR. CHU:  Oh, I don't know, Your Honor.  The — I think

12   the point of the direct testimony on the square footage was to

13   try and minimize the size of the unit as to make it look as

14   though the —

15          THE COURT:  But he already just said that it didn't

16   include common areas of any kind.

17          MR. CHU:  Correct.  And I just wanted to emphasize or

18   at least have him testify that the 600,- to $700,000 budget that

19   Mr. Tapp budgeted included everything.  At least for that — that

20   project.

21          THE COURT:  I think you better move on.

22          MR. CHU:  Okay.

23          THE COURT:  I assure you this is not the turning point

24   of the case.

25          MR. CHU:  I wouldn't think so, just a minor point.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 68 of
92

1  BY MR. CHU:

2  Q.  In — in talking about Exhibit D earlier I think you

3  testified that — you testified as to what your interpretation of

4  construction cost, quote and unquote was, correct?

5  A.  Yes.

6  Q.  You testified that construction cost included materials,

7  payments to subcontractors, payment to the laborers on the

8  project?

9  A.  Yes.

10 Q.  Did not — did not include permits, architectural fees,

11 correct?

12 A.  That's correct.

13 Q.  And also it also excluded any payment to Tony Fu for general

14 contractor fees.  That's — I think that's what you said?

15 A.  That's correct.

16 Q.  So Mr. Fu would not be entitled to any sort of contractor's

17 fees as far as construction costs?

18 A.  But the conversation under the agreement, that is the

19 25-percent ownership of the property, that would be the

20 compensation for his work as the contractor.  So he's not being

21 paid a lump sum for his work, but instead his compensation is

22 25-percent ownership.

23 Q.  Twenty-five-percent ownership?

24 A.  Yes.

25 Q.  All right.  Okay.  I think you just testified that Mr. Fu

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 69 of 92

1   had come to you with proposed side deals and change orders where

2   he asked you to pay for additional items?

3   A.  Yes.

4   Q.  And you said you refused and you never entered into any

5   agreements with him?

6   A.  That's correct.

7           MR. CHU:  I'd like to mark in rebuttal exhibit next in

8   order, Your Honor.  Are we at 121?

9           MR. ROMEO:  You're at 122, I believe.

10           MR. CHU:  122.

11  BY MR. CHU:

12  Q.  Mr. Yan, I'd like to show you a copy of a memorandum.  It

13  appears to be signed and dated by you and Mr. Fu on August 28,

14  2002.

15  A.  Okay.

16      (Counsel confer off record.)

17           MR. ROMEO:  Yeah, sure.  You could use it.  I know

18  what it is.  Go ahead.  We'll stipulate it can come into

19  evidence.

20  BY MR. CHU:

21  Q.  Is that your signature on the right-hand part of the

22  agreement?

23  A.  Yes.

24  Q.  And also the — also your signature at the left — left-hand

25  side of the agreement where it says — above the date?

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 70 of 92

1  A.  Yes.

2  Q.  Isn't this an agreement where you agree to pay 100 percent

3  of the costs to replace a kitchen cabinet and water heater?

4  A.  This is different from my understanding of a change order or

5  a side deal.  What I meant by a change order is that when Tony

6  comes to me and asks me for additional payment for the work that

7  he did without getting my permission first, whereas this is the

8  time when I complained to Tony that the work — that the material

9  that he put in was substandard and I wanted him to replace them.

10  And we had some argument as to whether he should, you know, be

11  responsible for changing the items here.

12        The item here specifically is for kitchen cabinets,

13  water heater, and hardwood floor.  And I recall that we had an

14  argument about this.  And then initially when we did this

15  agreement, this was drafted by Tony, and stated August 28th.

16  And the agreement, when we signed this on August 28th, was that

17  Tony and I will split the extra cost for the hardwood floor 50

18  and 50.

19        And then I don't — I don't recall exactly the reason

20  why he refused, but a couple of days later he came back to me

21  and he said he refused to do that.  So in — on the margin, on

22  the right-hand side margin, dated September 3rd, I put down

23  "Demas will pay for everything" because I was just — I was just

24  — I was just tired of arguing with him.  So I said, "Okay,

25  that's fine.  I'll pay for everything."

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 71 of 92

1          But I think what I meant by everything was the circled

2    item for kitchen cabinet and water heater.  And those I did pay

3    for myself and those weren't included, I don't believe, in my

4    accounting.

5          The hardwood floor, I think the agreement was that

6    still he will pay for half of the cost of the hardwood floor,

7    but then he — he breached this agreement also because he never

8    pay me any contribution for the hardwood floors.  So in my — so

9    I would say that basically this agreement is because of his

10   breach is the reason — I don't know what to term it, but even

11   though he agreed to, I think, to split the cost of the hardwood

12   floor, he still never actually kept up his promise.

13   Q.  And you also don't think this is a side deal either,

14   correct?

15   A.  Well, I guess if you — you can term it as side deal, but it

16   will not be a change order in that term, in the sense, because

17   it's something that I — I asked Tony to do.

18   Q.  You testified about Exhibits AAA and BBB.  Can I have you

19   turn to those?

20   A.  Yes.

21   Q.  Now this is — this — these appear to be permits that were

22   taken out at the time Winky Wong was the owner, correct?

23   A.  I don't know.  I actually didn't know about these permits at

24   the time.  But looking at the — let's see.

25   Q.  According to the permit, the exhibits, the owner was Winky

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 72 of
92

1   Wong?

2   A.  It's dated November 8th, 2001, the signature.

3   Q.  That is kind of strange, isn't it?

4          MR. CHU:  I think these are the two — I think these

5   two exhibits are the ones that I had some objections to, Your

6   Honor.  But, no, Mr. Yan does point out that the date is

7   November 8th, 2001 on both of the exhibits.  The —

8          THE COURT:  You know the filing date, the receive date

9   is, though, is 2000.

10         MR. CHU:  December 14th, 2000.  The owner is supposed

11  to be Winky Wong.

12         THE COURT:  He wasn't the owner even then, was he?

13         MR. CHU:  No.

14         MR. ROMEO:  What, in February 2000?

15         THE COURT:  No, in December of 2000.

16  BY MR. CHU:

17  Q.  Mr. Yan, do you have any knowledge as to whether these

18  permits were ever acted upon, whether anyone ever used them?

19  A.  I would say that I don't have firsthand knowledge of that.

20  I think probably Tony would be the one to answer that, but I got

21  this form the records at the Department of Building Inspections.

22  And these two exhibits were certified by DBI.

23  Q.  So — but you don't know whether these permits were the ones

24  that were actually used on the project or not, correct — in

25  fact, if I can refer you to Exhibit BBB, there seems to be an

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 73 of
92

1   annotation that the permit expired as of May 13th, 2002.  So...

2   A.  I don't know.  I can't answer your question.

3          MR. CHU:  I'd like to mark another exhibit next in

4   order.  This would be 123, I believe.

5          THE COURT:  Okay.

6   BY MR. CHU:

7   Q.  Let me show you this permit.  If I can look over your

8   shoulder?

9   A.  Sure.

10  Q.  This appears to be an application for a permit.  The permit

11  number is 221012.

12  A.  Yes.

13  Q.  Are you familiar — have you ever seen this before?

14  A.  Yes.

15  Q.  Can you describe what it is?

16  A.  This is a application for permit for electrical wiring and

17  fixtures for my property at 547 Twenty-Third Avenue and it's

18  signed by Tony Fu as the contractor.

19         THE COURT:  What do you need?  You want your copy

20  back?

21         MR. CHU:  Yes.  Thank you.

22  BY MR. CHU:

23  Q.  Is any of your writing on this document?

24  A.  The only handwriting that appears to be mine is my name

25  Demas Yan in the box for "owner."

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 74 of
92

1  Q.  This appears to be a permit for your other property, 547

2  Twenty-Third?

3  A.  Yes.

4  Q.  But someone had put in Winky Wong at the owner at some

5  point?

6  A.  I — I assume so, yes.

7  Q.  Do you recall if this is a permit that you had obtained

8  personally?

9  A.  I don't have much recollection of this.  As I said, the only

10  handwriting I would recognize is the name Demas Yan.

11          MR. CHU:  I'm sorry.  What was that exhibit number,

12  Your Honor?  Was it —

13          THE COURT:  123.

14          MR. CHU:  123.  Thank you.

15          THE COURT:  You want this marked?

16          MR. CHU:  Yes.  Yes.  Thank you, Your Honor.

17          I have another permit application.  It's — this will

18  be 124, I believe.

19  BY MR. CHU:

20  Q.  Mr. Yan, I'd like to show you another application for a

21  permit.  This is for a permit on the Twenty-Third Avenue

22  property and the number would be 405169.

23  A.  Okay.

24  Q.  Have you ever — have you ever seen this one before?

25  A.  Yes.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 75 of
92

1    Q.  Can you describe what that is?

2    A.  This — this I would assume is a permit application for

3    plumbing and mechanical, and this is for the project — for my

4    property at 547 Twenty-Third Avenue.  It's also signed by Tony

5    as the general contractor.  And I — none of this handwriting are

6    my handwriting.

7    Q.  Well, I'm — let me change subjects.  Do you — do you recall

8    testifying about the four $9,000 checks — or the six $9,000

9    checks that were written out of the Bank of America —

10   A.  Yes.

11   Q.  — account to Tony?

12   A.  Yes.

13   Q.  I think you already testified that Mr. Fu was not entitled

14   to any sort of payment —

15   A.  That's correct.

16   Q.  — out of the account?

17   A.  Yes.

18   Q.  Yet you signed those first four checks, did you not?

19   A.  Yes.

20   Q.  Now why is it that you would sign checks payable to him if

21   he were not entitled to any payment out of the account?

22   A.  I recall that when he gave me those checks to sign, they

23   were already filled out by Tony.  And he said that the memo line

24   says it's for pay, because he said that the works he hired, he

25   needs to pay the workers in cash.  So he told me that the

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 76 of
92

1  payments in cash to workers would be around $9,000 per month.

2  That's why I signed it.

3           And at the time I assumed that all the payments he

4  made out to the workers, to the daily workers, were in cash, but

5  now I'm not sure because he never gave me an accounting of how

6  he actually used the money.

7  Q.  Well, let me ask you about that.  Throughout the project you

8  never asked Mr. Fu for an accounting on the project, did you?

9  A.  No.

10  Q.  And really it wouldn't matter to you what he spent on the

11  project because his end was unlimited?  He needed to have the

12  project built, correct?  Didn't matter how much he spent?

13  A.  It didn't matter if he actually came up with the money that

14  he promised to come up with, that is, anything about 300k.

15  Q.  I think you probably heard Mr. Fu testify that the purpose

16  of having the Bank of America account was so that you could

17  despite your 300,000 in there so you could keep track of how

18  much you put in.  Was that pretty much what he said?

19  A.  Well, I heard his testimony, but I don't agree with it.

20  Q.  So you're saying that you were entitled to contribute your

21  $300,000 through other ways?

22  A.  Well, the — the purpose of the Bank of America account is

23  really for me to make sure that the money I contribute was

24  actually used for construction.  And the purpose is mainly

25  because even though sometimes I'm around to sign checks or pay

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 77 of
92

1    the vendors directly, Tony would be the most convenient person

2    to do that.  That's why — and also because sometimes I travel,

3    so there needs to be a pool of money for Tony to draw on for

4    construction purposes.  And that's the main reason for having

5    the Bank of America account, is that that is a pool of money

6    earmarked for construction.  My contribution to contract — to

7    the construction for one $300,000 obviously has no reason why it

8    has to always to go through the BofA account, as long as it's,

9    you know, pay for construction reasons.

10   Q.  I think your testimony earlier was that Mr. Fu was

11   responsible for the construction.  You were putting up the

12   money, correct?

13   A.  Yes.

14   Q.  In addition, you were also supposed to take care of like the

15   architectural fees and getting permits —

16   A.  Correct.

17   Q.  — also, correct?

18   A.  Yes.

19   Q.  Yes?

20   A.  Yes.

21   Q.  Okay.  Now but if Mr. Fu has taken care of the construction

22   and you were paying for construction costs on the side, how

23   would he know that you were making payments towards your first

24   $300,000?

25   A.  Because any payment I made I made at the direction of Tony.

1  It's Tony who tells me who to pay or when to pay.

2  Q.  So —

3  A.  Because I have no control over, you know, what type of

4  material he will buy at one time or what people he hires.  Would

5  every item in my accounting, all the payments, items outside of

6  the Bank of America account, those were paid because Tony told

7  me to pay them.

8  Q.  So it's basically your word against his word then?  If he

9  denies that he told you to pay him, —

10 A.  No, because I have —

11         MR. ROMEO:  Objection, Your Honor.  I think it's just

12 an argumentative question.  I don't think he has to answer that.

13         MR. CHU:  I'm trying to figure out how the deal works.

14         THE COURT:  You can have the question.

15 BY MR. CHU:

16 Q.  Pardon me.  Was there an answer to the question?  I —

17 A.  I don't think you finished your question.

18 Q.  So — oh, okay.  So it's basically your word against Mr. Fu's

19 word as far as whether a — an outside payment counts towards the

20 300,000?

21 A.  No, I —

22 Q.  I —

23         MR. ROMEO:  You know, I — and that's, Your Honor, why

24 I object to the question.  It's like — it's just an

25 argumentative question.  His word against his word.  No, it

Case: 04-33526    Doc# 129    Filed: 06/16/06    Entered: 06/16/06 01:02:47    Page 79 of
92

1    might not be.  I mean there's a lot of things that —

2              THE WITNESS:  I don't know —

3              THE COURT:  I think you better come up with a

4    different question.  I don't know what that would really mean, —

5              MR. CHU:  I'll —

6              THE COURT:  — the answer would mean.

7              MR. CHU:  I'll try a different question, Your Honor.

8    BY MR. CHU:

9    Q.  So under your agreement with Mr. Fu, you would only pay a

10   Chenery construction cost outside of the Bank of America account

11   if Mr. Fu instructed you to pay it?

12   A.  Yes, and if I can show by proof that it actually spends on

13   Chenery Street.

14   Q.  But you were working on other projects at the time; were you

15   not?

16   A.  At what time?

17   Q.  Between May of 2001 and August of 2003 you were also working

18   on the 23rd Avenue property; were you not?

19   A.  That's partially correct because — let's see.  From May of

20   2001 to, I think, September of 2002 I don't have any other

21   project going on.  Beginning in September 2002 I was able to

22   restart work on the — my project at 547 Twenty-Third Avenue.

23   Q.  Now — I'm sorry.  I have to go back to those $9,000 checks

24   that you signed.  When Mr. Fu asked you to sign the check,

25   didn't you think it would have been odd for him to ask you to

1   sign a check when he could have signed it himself?

2   A.  No, because the money in the account was earmarked for

3   construction purposes only and Tony is not supposed to pay

4   himself anything for his service.  So, of course, if the check

5   is made out to his name then, of course, he needs my permission.

6   Q.  I see that in your list of the payments that you say were

7   unauthorized you included all the payments that you made to Mr.

8   Fu, including those four $9,000 payments.

9   A.  Yes.

10  Q.  You called them unauthorized even though you signed the

11  check to him?

12  A.  That's because — I signed them because Tony told me that

13  they were used to pay the workers.  And now he's claiming that

14  is for a old debt I owe him on Majestic.  So now I — I can't

15  really say for sure that he actually spend the money on the

16  workers or whether he pocketed the money himself.

17  Q.  Well, what difference does it make to you?  The project's

18  completed.

19  A.  Well, like I said, it wouldn't make any difference to me if

20  all I put in was $300,000 and Tony kept up his side of the

21  bargain, but he did not.

22  Q.  Sorry to be a little bit scattered on this, but as far as

23  the side deals, it's — your testimony was that 300,000 was the

24  maximum you were supposed to put in and that you never agreed to

25  pay more, correct?

1    A.  Yes.

2    Q.  But that doesn't count that other — I don't know if you want

3    to call it a side deal, or whatever, but the — the agreement to

4    pay for the water heater and the floors, and — in Exhibit — 122?

5              MR. ROMEO:  120.

6    BY MR. CHU:

7    Q.  — 120, — 122, that you don't count this as being part of the

8    300,000, correct?

9    A.  Well, what the — the total amount involved in this so-called

10   side deal, I would say, is only maybe 3,-, $4,000.  It's — it's

11   real hard to say whether this counts toward my 300k because

12   under our initial agreement is that he will build the project

13   according to the plan, and he promised me that he won't use the

14   cheapest material, that he will use average quality material.

15   So we have a — some — some dispute about whether he — he kept up

16   his promise of using average material in a project.

17             So from my — from my point of view, I think, you know,

18   the kitchen cabinets, the hardwood floor, that's something that

19   should be included in the $300,000, but for the sake of argument

20   I — I just agreed to share the expense with him.

21             But, like I said, even though he agreed to share the

22   expenses he actually never reimbursed me for those.

23   Q.  But you did agree to pay some amounts over $300,000; did you

24   not?

25   A.  I would say that this is the only item that may be the case

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 82 of
92

1  where I agreed to pay for buying better material.

2  Q.  Well, how about the build-out on the commercial unit?

3  A.  No, I never agreed to anything like that.

4  Q.  So you paid for all that, and you wanted that to count

5  towards the 300,000?

6  A.  There is no build-out in the commercial unit.  It's just

7  build out according to the plan.  The City requires us to put

8  that — put in the plumbings for the bathroom.  And — and those

9  were a part of the plan that was submitted.  So there's no extra

10  work outside of the scope of the original plan.

11  Q.  Did you have an idea of how much it was going to cost to

12  build the condominium at the time you entered into the agreement

13  with Mr. Fu?

14  A.  We had some discussions, because at the time I didn't have

15  any construction experience.  So I relied on Tony's judgment.

16  So I think when — before what — or during my negotiation with

17  Mr. Winky Wong for the first agreement, I think I asked Tony

18  about how much it will cost us to build the property, the new

19  property.  And I think at the time he told me that he can do it

20  like under $400,000 that I — I take it as actual cost, not any

21  over — not any profit for a contractor.

22        And then after we canceled the Winky Wong agreement,

23  when I — when Tony and myself negotiate this new agreement,

24  suddenly he — he raised his estimate and he said that he — I

25  think he mentioned like it would cost $600,000 to — to build it.

1          And, frankly, I didn't — I didn't really take his

2    estimate too seriously.  But, anyway, I — I agreed that I'll pay

3    for the first $300,000 and then he'll — he'll be responsible for

4    the rest.

5    Q.   Let me ask you more — ask you some questions about Ming Fong

6    now.

7          You testified earlier that you met him in San

8    Francisco for lunch one time.  This is before the Chenery

9    project got started.  And you also met him in Hong Kong once

10   where he gave you his bus- — his business card?

11   A.   Yes.

12   Q.   You had lunch in Hong Kong?

13   A.   Yes.

14   Q.   You say he told you his occupation was that he was

15   restauranteur?

16   A.   Yes.

17   Q.   Did — was that in his restaurant you ate at, or...?

18   A.   No.  He owned a restaurant in the Quan Tjoe (phonetic) in

19   China.

20   Q.   And — and he never told you that he was in the construction

21   business?

22   A.   No.

23   Q.   And you never saw Mr. Fong at the construction site at all?

24   A.   No.

25   Q.   So you never had — besides those two, two occasions, you

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 84 of
92

1   never — never had any other dealings with him?

2   A.   No.

3   Q.   Mr. Yan, do you have a checking account at American Express

4   Centurion Bank?

5   A.   I think that is my credit card.

6   Q.   That's your credit card account?

7   A.   Yes.

8   Q.   So that's where you can write checks and it goes to the

9   credit card?

10  A.   No.   Which exhibit are you referring to?

11  Q.   No exhibit yet.   I'm just — I'm just asking you if you

12  have —

13  A.   I can't say for sure because I — I had many accounts before.

14  Q.   Have your — your address is 1433 Seventh Avenue?

15  A.   Yes.

16          MR. CHU:   I'd like to have another exhibit marked in

17  order, Your Honor.

18          THE COURT:   Okay.   This will be 124?

19          MR. CHU:   124.

20          MR. ROMEO:   No, it should be 125.

21          MR. CHU:   125.

22          THE COURT:   125?   Yes, that's right.

23  BY MR. CHU:

24  Q.   Let me show you a copy of 125.

25  A.   Okay.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 85 of 92

1  Q.  It appears to be a check drawn on your act at American

2  Express Centurion Bank, check number 7227 in the amount of

3  $4,000 made payable to a Ming Fong.

4           Is that your signature at the bottom of the check?

5  A.  Yes.

6  Q.  Why would you be writing out a check to Ming Fong for

7  $4,000; was that for lunch?

8  A.  I didn't write this check out to Ming Fong actually.  I need

9  to refer back whether I gave this check to Tony.  Did — my — oh,

10  the handwriting I recognize is the date; the amount, $4,000.

11  But the handwriting for "Ming Fong," that's not my handwriting.

12  Q.  You don't recall Mr. Fong doing a remodel job at your house?

13  Didn't you hire him to remodel your house?

14  A.  Which house?

15  Q.  I don't know.  You tell me —

16  A.  I don't know.  I never hired Ming Fong to do anything.

17  Q.  Which — which house did you have remodeled?

18  A.  At what time?

19  Q.  Oh, I'd say around October of 2002 sometime.

20  A.  I never remodeled any house in 2002, I don't think.

21  Q.  How about the Seventh Avenue house, you didn't have some

22  work done, some bathroom work?

23  A.  2000.  I'm not sure.  I — I vaguely recall that.  2002?  I

24  don't think so.  I need to look back, because I — I remember —

25  the house at Seventh Avenue belongs to my parents, and there was

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 86 of
92

1  a upstair unit.  And the tenants move out, I think, in 2000.

2  And I had some — let's see — Tony did not do any work for me.  I

3  had some subcontractor that was re- — they were referred by Tony

4  to come out to do that work.

5  Q.  Now —

6  A.  But that was the only work I think done at Seventh Avenue,

7  but that's — and I think in 2000 — not in 2002.  And this check,

8  I — I don't — I've never seen this before.  I don't know whether

9  it clear or not but, like I said, I don't know whether I gave

10 this check to Tony for something else.  But the payee, "Ming

11 Fong," that's not in my handwriting.  I never intended to pay

12 Ming Fong $4,000.

13             MR. CHU:  I don't have anything — I don't think — I

14 don't have anything further, Your Honor.

15             THE COURT:  Okay.  Mr. Romeo.

16             MR. ROMEO:  I don't have any — anything further.

17             THE WITNESS:  Your Honor, I would like to take a

18 minute to refer back to my accounting of my expenses for

19 Chenery.

20             THE COURT:  Your counsel has to ask you questions.

21             MR. ROMEO:  Can I take a short —

22             THE COURT:  Yeah, we can take a short break.

23             MR. ROMEO:  — conference with my client then?

24             THE COURT:  Okay.  And I assume this will be quick

25 then, and we'll be ending soon.

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 87 of
92

1          MR. ROMEO:  Yes.

2          THE COURT:  Think about when you want to argue this.

3          MR. ROMEO:  Okay.

4          THE COURT:  Do you want to do it tomorrow?

5          MR. ROMEO:  I'm sorry.

6          THE COURT:  Do you want to do it tomorrow?  Let me —

7    I'll come back with some times for you that you — well, I'll

8    look at times for the argument while you folks take a very short

9    break.  Okay?

10         All right.  Do you need more than a minute?  Do you

11   want to recess or do you just want to talk for a second?

12         MR. ROMEO:  No, I think we're ready to — to —

13         THE COURT:  Okay.  Let's — let's finish now.  That's

14   fine.  That's good.

15      (Comments off the record re calendar.)

16         MR. CHU:  Your Honor, I'm sorry to — Mr. Fu is also a

17   party pro per in this action so he's representing himself also.

18   He would like to add some — he would also like to read some

19   deposition transcript into the record, as well.

20         THE COURT:  Why don't you just tell me, and then I'll

21   read it.

22         MR. FU:  Okay.

23         THE COURT:  Just introdu- — you just offer it for the

24   record.  Is it the deposition of a party?

25         MR. FU:  Yes, deposition of Mr. —

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 88 of
92

1     (Simultaneous talking.)

2         THE COURT:  That's freely admissible, so you can just

3  give me the pages and I will read them.

4         MR. FU:  Okay.  May I read it to you?

5         THE COURT:  No.  Just —

6         THE CLERK:  Give him the page.

7         THE COURT:  I'll read them.

8         MR. FU:  Oh, okay.  Okay.

9         THE COURT:  Just give me the pages, —

10        MR. FU:  Okay.  Okay.

11        THE COURT:  — and I'll read them.  We'll make it part

12 of the record.

13        MR. FU:  Okay.

14        THE COURT:  Okay.  Go ahead, Mr. Romeo.

15        But you may do that.  You take your time and figure

16 out what pages you want, and I will read them —

17        MR. FU:  Thank you.

18        THE COURT:  — myself.  And I'll just keep them here so

19 I can study them.

20                    <u>REDIRECT EXAMINATION</u>

21 BY MR. ROMEO:

22 Q.  Mr. Yan, can you look at your Exhibit KK?

23 A.  Yes.

24 Q.  Can you go to page 2 of Exhibit KK to an entry that is dated

25 11-1-02?

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 89 of
92

1          THE COURT:  I'm sorry.  What page?

2          MR. ROMEO:  It's on page 2 —

3          THE COURT:  Page 2.

4          MR. ROMEO:  — of Exhibit KK.

5    BY MR. ROMEO:

6    Q.  The date is 11-1-02?

7    A.  Yes, it's the fourth item from the bottom.

8    Q.  Yes.

9          THE COURT:  Yes.

10   BY MR. ROMEO:

11   Q.  Reading across it says, "Floor," and then the amount, 4,000.

12   And then it says, "Method of Payment," and it says 7227.

13          Do you see that?

14   A.  Yes.  That refers to —

15   Q.  Now let me ask you — let me ask the question —

16   A.  Okay.

17   Q.  — first.  You just saw Exhibit 125, correct?

18   A.  Yes.

19   Q.  And does the 7227 and the amount of $4,000, does that

20   correspond to this entry here for the floor for $4,000?

21   A.  Yes.

22   Q.  So this is for a hardwood floor?

23   A.  Yes.

24   Q.  And this was on an AmEx account?

25          This is a courtesy check, in other words, correct?

Case: 04-33526   Doc# 129   Filed: 06/16/06   Entered: 06/16/06 01:02:47   Page 90 of 92

1   A.  Yes.  I believe it's my convenience check on my credit card.

2   Q.  So you don't get the canceled check back in your statement,

3   do you?

4   A.  I don't think so.

5   Q.  And your testimony earlier today was that when you were

6   asked to pay — when you needed to pay an expense for the Chenery

7   project that it was Mr. Fu that directed you to pay that

8   expense?

9   A.  Yes.

10  Q.  And so did you give him this check signed by you?

11  A.  Looking at this, this would be a check I gave to Tony.

12  Q.  Did you give him a check with the payee filled out?

13  A.  No.

14  Q.  Is this a similar situation, such as we had with Exhibit RR,

15  where your parents gave Mr. — wrote out two checks which you

16  gave to Mr. Fu with the payee not filled out?

17  A.  That would be a similar situation.

18          MR. ROMEO:  Okay.  I have no further questions, Your

19  Honor.

20          THE COURT:  Any further cross?

21          MR. CHU:  No, Your Honor.

22          THE COURT:  Thank you, Mr. Yan.  You may step down.

23      (Witness excused at 4:10 o'clock p.m. and the portion of

24  the proceedings ordered for this date ends at this time.)

25                          —o0o—

State of California            )
                              )    SS.
County of San Joaquin          )


        I, Susan Palmer, certify that the foregoing is a true
and correct transcript, to the best of my ability, of the above
pages, of the digital recording provided to me by the United
States Bankruptcy Court, Northern District of California, of the
proceedings taken on the date and time previously stated in the
above matter.

        I further certify that I am not a party to nor in any
way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber
by the American Association of Electronic Reporters and
Transcribers, Certificate No. 00124.  Palmer Reporting Services
is approved by the Administrative Office of the United States
Courts to officially prepare transcripts for the U.S. District
and Bankruptcy Courts.


                              Susan Palmer
                              Palmer Reporting Services

                              Dated June 13, 2006