MARK J. ROMEO    SBN 112002
LAW OFFICES OF MARK J. ROMEO
130 Sutter Street, 7th Floor
San Francisco, CA 94104
Telephone: (415) 395-9315
Facsimile:     (415) 395-9318
*romeolaw@msn.com*

Attorneys for Debtor
DEMAS WAI YAN

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re  DEMAS WAI YAN,<br><br>Debtor. | Bk. No. 04-3 3526 tec<br><br>Chapter 11<br>**DECLARATION OF DEBTOR DEMAS YAN IN OPPOSITION TO TRUSTEE'S MOTION TO CONFIRM COMPROMISE**<br><br>Date: July 24, 2006<br>Time: 9:30 a.m.<br>Court: Hon. Thomas Carlson<br>       235 Pine St. 23d Floor<br>       San Francisco, CA 94104 |

I, DEMAS YAN, say:

1. I am the debtor in this proceeding. I have been served with the Trustee's Motion to Confirm Proposed Compromise of the Stella Chen claim in Adversary No. 05-03236.

2. Before the court rules on the motion, I believe the court should consider and evaluate whether the compromise is in the best interests of the estate in light of potential grounds

for a new trial motion which could be pursued by the Trustee in this matter. I have met with the trustee and her counsel on July 12, 2006, and provided the information in this declaration to them in writing. I believe that the court and the Trustee should consider that a new trial motion under FRCP Rule 60(b) could be made in this case, and that the compromise should be evaluated in this light.

3. The motion should contain three issues. The first issue is that there is new evidence that could be submitted under Rule 60(b)(2). In regard to the alleged purchase and sale of high tech equipment which was the alleged reason for the Hong Kong loan in February 2002, Tony Fu said at his deposition that he did not know who were the seller and buyer of the high-tech products.

[Fu deposition, June 17, 2005: Page 7:5-14]:

> Q. And on the sale of the high-tech equipment, do you know who was doing the selling and who was doing the buying?
> A. Who was dealing the selling? Okay, you mean, um, how he conduct his business?
> Q. Yes.
> A. That kind of doing I don't know. He told me, Demas, he told me that he got that bunch of equipment, high-tech equipment, from Singapore from a friend of his.

Fu changed his testimony at trial, saying for the first time that the seller of the high tech products was "Jimmy." [July 26, 2005, TR 213:19-214:5]

> Q In your deposition, you told me that the person or company that -- the people that he was buying the products from, the components or whatever, the high tech equipment I think you called it -- that those people were in Singapore, correct?
> A The contact. His contact, the man, the business contact to sell him the equipment is a single man called Jimmy. That's what he told me.
> Q Okay. And so he was going to buy equipment, either by or through Jimmy -- this is according to what Demas told you, correct?
> A That was correct.

By contrast, Fei Sing Fu said at trial that the seller was **in Hong Kong** during Feb/2002.

[July 26, 2005, TR 27:4-28:1]

Q Did Mr. Yan explain to you what transaction he was seeking to finance with the loan he was going to borrow from you and Mr. Leung?
A Computer software.
Q Okay. Did he say that it was a deal in which he was going to act as a buyer or a seller of computer software?
A He would sell the parts to mainland China.
Q And did Mr. -- so Mr. Yan was going to acquire – told you he was going to acquire some kind of parts or equipment or components and sell them to mainland China, correct?
A He would buy the computer parts and sell it to China.
Q Okay. Now did Mr. Yan tell you where he was going to buy the computer parts?
A He said from Singapore.
Q Did Mr. Yan mention whether he had had any meetings or traveled to Singapore in connection with this transaction?
A He said his client was already in Hong Kong, and that was why he needed 3.6 million Hong Kong currency.
Q He said his client, meaning who, the buyer or the seller?
A The client who sold him the parts.
Q And that would be the person from Singapore, correct?
A Yes.

5. The "Jimmy" referred to is a friend of mine, Jimmy Thia. I went to Singapore in May, 2006 on business. On that trip, I talked to Jimmy. He recalled that he met Tony once in San Francisco around 2000, and that he was with me in Phuket, Thailand for part of Feb/Mar 2002. This was the time Tony Fu says they were trying to find me to ask about the loan. But in fact Tony was able to communicate with me as evidenced by the fax he sent asking me to cancel the Winky Wong Agreement. There was no mention of the loan in that fax or any other written communication. Jimmy recalled that he was not in Hong Kong. He can provide his passport as proof of his whereabouts in Feb/Mar 2002. He could testify that I never discussed with him about buying equipment to sell to China. Jimmy has signed a declaration to this effect and will also

appear as witness. A true and correct copy of his declaration is attached hereto as Exhibit 1 and made a part hereof.

6. The reason this is new evidence is that Fu testified in deposition that he did not know the seller of the equipment. So there was no way for me to do rebuttal discovery on the seller. The first time he said Jimmy was the seller was at the trial. Also, due to the fact that my wife and my first infant daughter immigrated to San Francisco from China in September 2004. Soon after I filed bankruptcy in this court in December 2004. My wife became pregnant with my second daughter in 2005. My second daughter was born in March of this year. I cannot travel to Asia for discovery before the trial because of family responsibilities and financial restraints.

7. This would change the outcome of the trial because the plaintiff's witnesses testified that the reason they gave me a cash loan of HK$3.6M was because I needed to buy equipment from Singapore. If they say that Jimmy was the seller and Jimmy comes forward and denies it, then it is direct proof that there was never a reason for a loan.

8. Another issue of new evidence is whether I knew one of the alleged Hong Kong lenders, Leung Hing Lau. Since I have never met him, I did not and still do not know what his occupation was before he died in 2003. In the state court law suit, I asked Stella Chen at her deposition what was Leung's occupation, and she said she did not know. [Deposition Stella Chen Sept 17, 2004].

Q. And what does this person Leung Hing Lau does for a living?

THE WITNESS: I don't know.

Fei Sing Fu said at trial that Leung was very rich and is an executive at a very big real estate

company called "Cheung On Real Estate." [July 26, 2005, TR 29:9-13] I traveled to Hong Kong in March and again in May of this year for my job. While I was there, I talked to John Yeung who is a detective. He investigated and found that there is no such company. Also, he found that Leung was actually a professional photographer with some of his works exhibited at the Hong Kong Heritage Museum. Mr. Yeung's declaration regarding these matters is attached hereto as Exhibit 2 and made a part hereof. He would agree to testify as a witness.

9. The reason this is new evidence is that the plaintiff's witnesses did not say that Leung was an executive at Cheung On Real Estate until at trial, so I cannot do any discovery on such a company. The evidence that such a company does not exist is substantive evidence.

10. This would change the outcome of the trial because the plaintiff's witnesses claimed that the alleged loan was in cash because Leung is very rich and he is an executive at a very big company. They have not provided any proof of source of funds for the loan. If Leung was not an executive at such a company because there is no such company, then that would undercut the evidence that there was the means to give me the alleged cash loan.

11. I believe that the Trustee and the court should further consider the availability of grounds under FRCP Rule 60(b)(6). In the court's Amended Decision after Trial, March 3, 2006, the Court said:

> (24) Yan's testimony that the Note represented Fu's rights under the Joint-Venture Agreement is undermined by his own testimony regarding the operation of that Agreement. Yan testified that the $450,000 payable under the Note represented Fu's 25 percent interest in the sales proceeds of the Property, which at the time the Note was signed, the parties estimated would be about $1.8 million. Such a calculation proceeds from the assumption that Fu's share was to be calculated from gross proceeds (i.e., without deducting the mortgages to be paid from the sale price). In contesting payment of Suen's claim to 25 percent of the $2.3 gross proceeds of sale, however, Yan testified that the shares each party was to receive under the Joint-Venture Agreement were to be

calculated from net proceeds after the mortgages on the Property at the time the Agreement was signed were paid. If believed, this testimony severs the asserted link between the amount due under the Note and the amount due under the Joint-Venture Agreement. Whether or not believed, the inconsistency in testimony undermines Yan's credibility.

[AMENDED DECISION AFTER TRIAL, March 3, 2006, Pages 9:22-10:11]. But my testimony at trial was the opposite of what the court said I testified to:

> Q. Mr. Yan, if you could open the exhibit book from Phase 1 to Exhibit D to look at the - not the plaintiffs' - do I have it here? Oh, maybe look at that. I want you to look at the contract again real quickly, Exhibit D.
> A. Okay.
> Q. And if I could just read over your shoulder here for a minute. With regard to paragraph, it says, "The said property is either up for sale or rent. The proceeds shall distribute according to the ownership percentage." That particular provisions, what - was there an understanding between you and Mr. Fu as to what were the proceeds?
> A. I don't think we were quite definite, because this agreement was drafted by me and with Tony's input. And, frankly, it's just very informal. I don't think we ever put much thought into the legal meaning of the word "proceeds."
> Q. Does that - are you familiar with the term "seller's proceeds"?
> A. Yes.
> Q. Would that be the equivalent of seller's proceeds?
> A. That would be. Then that's after - then that's of the sales price minus any existing encumbrance on the property and closing costs.
> Q. Is that what the term "proceeds" means in the case of this contract?
> A. I - honestly - honestly speaking, I don't think we would define what - what that meant.
> Q. Okay. So you didn't discuss it one way or the other?
> A. No.

[Yan Direct 12_1_05, TR 60:21-62:1]

12. The court made an incorrect reading of the evidence at trial to say that I testified the proceed was to be "net." As the Court described it, it was a very close case. So for the Court to misinterpret the evidence is extremely unfair. I testified to the truth at trial that the $450,000 is an estimate of the value of the 25% ownership, and that the term "sales proceed" was not NET

and was not predefined by Tony and me. The $450,000 representing the 25% estimate value is the direct link between the Promissory Note and the Construction Agreement. The Court said that this link was broken because of my testimony that the proceeds was "net." but I never said that. So the link is not broken and the finding is not justified. Further, if from this, the Court assumed that my credibility was in question, the Court may not have weighed all of the evidence in a fair light. For sake of a fair trial and equity, the Court should order a new trial.

13. Copies of the relevant transcripts of the deposition of Stella Chen, and the trial testimony of Demas Yan, Tony Fu and Fei Sing Fu are attached to this declaration as respectively Exhibits 3-6 and made a part hereof.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct of my own personal knowledge, that I can give competent testimony thereto if called as a witness in court, and that this Declaration was executed at San Francisco, California on July 17, 2006.

/s/Demas Yan
Demas Yan

8542-01\PLEAD\COMPROMISE-DEC-YAN    DECL. OF DEMAS YAN-MOT. -CONFIRM COMPROMISE Page 7

Case: 04-33526   Doc# 139-1   Filed: 07/17/06   Entered: 07/17/06 16:46:15   Page 7 of 7